The First National Bank of Hoboken, New Jersey, et al., trustees, complainants,

*v.*

Steneck Title and Mortgage Guaranty Company et al., defendants.

[Decided December 28th, 1934.]

Mr. *Matthew J. Tackella* and Mr. *J. W. Rufus Besson,* for the complainants.

Mr. *John Milton* and Mr. *Henry J. Camby,* for the commissioner of banking and insurance and Steneck Title and Mortgage Guaranty Company.

Messrs. *Walscheid & Rosenkranz,* Mr. *Martin G. Schwartz,* Messrs. *Harber & Freesman,* Mr. *H. David Zerman,* Mr. *Ernest L. Quackenbush* (and others at final hearing), for the various certificate holders.

Fielder, V. C.

The Steneck Title and Mortgage Guaranty Company (hereinafter called Title Company), as part of its business, loaned and invested money on real estate bonds and mortgages, many

if not all of which, it deposited with Steneck Trust Company (hereinafter called Trust Company), as trustee and against the mortgages so deposited the Title Company issued and sold participation certificates and by such certificates guaranteed payment of the principal and interest thereof. June 27th, 1931, the commissioner of banking and insurance took possession of the business and properties of both corporations and proceeded to liquidate them. Thereafter on application to this court by said commissioner, an order was entered July 14th, 1933, relieving the commissioner and the Trust Company from further duties as trustee and appointing the complainants First National Bank of Hoboken and J. W. Rufus Besson as trustees in place of the Trust Company. In the instant suit the new trustees apply to this court for instructions and directions as to various difficulties and problems which confront them in the administration of their trust. They have possession of bonds and mortgages for a total of nearly $1,200,000 and they have foreclosed mortgages for a total of $162,000, under which foreclosures they have bought in or accepted deeds for the foreclosed property and the total amount of participation certificates issued by the Title Company and outstanding is $2,057,435. I understand that under the administration of the commissioner of banking and insurance, some trust mortgages were paid off or reduced in amount, others were foreclosed and title taken in the name of the Title Company and that the money so paid on mortgages and the titles to the foreclosed properties have been or will be turned over to the complainants by the commissioner and the Title Company to hold as part of complainants' trust. The certificate holders are so numerous, many being without the jurisdiction of the court, that it was deemed impracticable to make all of them parties to this cause and it was considered that the rights of all could be protected herein by making the holders of more than ten per cent. of the total certificates issued, defendants as representatives of their own interests and of other certificate holders similarly situated and accordingly the bill of complaint names the commissioner of banking and insurance and more than one hundred and thirty certificate holders as defendants herein.

The minutes of a meeting of directors of the Title Company held November 8th, 1928, show the adoption of a resolution to enter into an agreement with the Trust Company for the latter to act as trustee for the issuance of participation certificates and that upon such agreement being entered into, all bonds and mortgages of the Title Company should be delivered to the Trust Company against which such certificates would be issued. This was the only corporate action taken by the Title Company concerning the issuing of certificates and the only agreement entered into between it and the Trust Company bears date October 10th, 1929. By the terms of that agreement the Title Company deposited with the Trust Company certain bonds and mortgages and agreed to add thereto other bonds and mortgages, against which guaranteed participation certificates would be issued in the form set out in the agreement. The Title Company commenced to issue participation certificates November, 1928, notwithstanding that the trust agreement was not entered into until almost a year later and all certificates (called blue certificates) issued thereafter and up to January 12th, 1931, were in the form set out in the trust agreement and purported to be issued against a group of bonds and mortgages deposited by the Title Company with the Trust Company. After January. 12th, 1931, the Title Company discontinued the issue of the blue certificates and thereafter and up to the time the commissioner of banking and insurance took over the two corporations, it issued two kinds of certificates, one known as T certificates and the other known as D certificates. The T certificates are identical in form with the discontinued blue certificates and assign to the holder "an undivided share * * * in and to certain bonds and mortgages * * * held in special deposit by the Banking Corporation of the State of New Jersey under a trust agreement by and between ourselves and Steneck Trust Company as trustee." The D certificates are identical in language with the T certificates, except that the D certificates, besides using the above quoted words to express assignment of an undivided share in bonds and mortgages deposited with the trustee, also describe a particular mortgage and purport to assign a share therein,

so it may be claimed that in form the D certificates assign to the holder thereof a share in a particular mortgage and also a share in all other mortgages deposited with the trustee. These D certificates were issued without any corporate act of the Title Company authorizing them and contrary to the provisions of the trust agreement. They present for determination the question of the rights of the holders thereof as against the rights of holders of blue and T certificates.

The mechanics for issuing certificates were handled by the Trust Company exclusively. The only record produced to show what bonds and mortgages were delivered (there was no formal assignment) to the Trust Company and how they were treated with respect to the trust, is a series of cards kept by the Trust Company. That company was agent of the Title Company for the sale of certificates; after January 12th, 1931, it decided whether to issue to investors T or D certificates; it received for the Title Company the proceeds of sale of certificates and delivered certificates to investors after they were executed by Title Company officers. The only part taken by the Title Company in the allocation of mortgages to certificates was to execute the participation certificates as prepared by the Trust Company. Prior to January 12th, 1931, it was the custom of the Trust Company, through its card system, to allocate certain series or groups of mortgages to particular certificates, but after that date the custom apparently was abandoned and all mortgages were treated as a single group against which all T certificates were allocated. It does not appear that any purchaser of a blue or T certificate bargained for a certificate against any particular group or series of mortgages, or knew or inquired as to what group or series the certificates sold him would apply and it is to be noted that neither the blue nor the T certificates specify or identify any particular series or group, but speak generally of bonds and mortgages deposited with the trustee. D certificates were issued only to purchasers who expressed a wish for participation in some single mortgage and in no instance when a D certificate was issued did any purchaser choose a particular mortgage; he accepted what the Trust Company chose for him.

1. As I have said, the D certificates are identical in language with the blue and T certificates, except that words were added to the D certificates to describe a particular mortgage. Without mentioning the provisions contained in the D certificates, I think it sufficient to say that any purchaser of one of those certificates who read it, should at once observe that the expressions therein contained were inapplicable to a single mortgage, but applied to a group of mortgages. Particularly do those certificates notify a purchaser that bonds and mortgages against which those certificates were issued, were on special deposit with the Trust Company under a trust agreement and that such agreement governed the issuance of certificates. By the terms of those certificates, the purchasers thereof agreed with the Title Company and with all other holders of certificates, that all certificates issued by the Title Company would be subject to the provisions of the trust agreement. And further, each D certificate bore the certification of the Trust Company that it was issued under a trust agreement between the Title Company and the Trust Company dated November 1st, 1928, and that the mortgages referred to in the certificate were held by the Trust Company under said trust agreement for the benefit of all parties interested. Of course the stated date of the trust agreement was incorrect; it is but one of the many instances of the careless and haphazard manner in which the Title Company and the Trust Company conducted the former's mortgage participation business. Why the correct date of the trust agreement was not stated does not appear but the participation certificates and the trustee's authentication gave ample notice to the purchasers of all certificates that the authority for their issuance was based on a trust agreement and such notice put the purchasers of D certificates on inquiry. Application by such a purchaser for inspection of the trust agreement would have disclosed that the agreement was dated October 10th, 1929, and not November 1st, 1928. Such inspection also would have disclosed the fact that the agreement contained no authority for the issuance of participation certificates against a particular mortgage. The Title Company, having issued D certificates, might be estopped to

question their validity but that is not the question here raised—the issue is between the holders of blue and T certificates on the one hand and the holders of D certificates on the other.

Naturally no D certificates could be issued against a particular mortgage until that mortgage had been deposited with the trustee. Since there was no authority by corporate act of the Title Company, or under the terms of the trust agreement, for deposit of mortgages with the trustee for any purpose outside the trust agreement and since there is no evidence that any mortgage was actually deposited with the trustee for any purpose other than as specified in the trust agreement, it must be assumed that as each mortgage was deposited with the trustee, the trustee received and held it under the terms of the agreement; thereupon the rights of holders of blue certificates and of T certificates theretofore and thereafter to be issued attached under the terms of the trust agreement to each mortgage immediately upon its deposit with the trustee and D certificates issued against any such mortgage were in derogation of the rights of the holders of blue and T certificates. Neither the Title Company nor the Trust Company had the power as against the holders of blue and T certificates to vary the terms of the trust agreement by issuing D certificates. The rights of holders of blue and T certificates were fixed, before the Title Company commenced to issue D certificates, in all mortgages then and thereafter to be deposited in the trust and there is no evidence that in any instance a purchase of a T certificate was made with knowledge that the Title Company was issuing D certificates against a mortgage which, by the terms of the trust agreement, belonged to the group of mortgages. I reach the conclusion that the holders of D certificates purchased such certificates with notice that as against holders of blue and T certificates, the Title Company had no right to issue participation certificates in any particular mortgage deposited with the Trust Company; that the holders of D certificates are not entitled to preference in payment out of the particular mortgage described in their certificates and that they must stand in the same situation with all other

certificate holders and share *pro rata* in all mortgages (or their proceeds) deposited with the Trust Company.

I believe my conclusion that the rights of all certificate holders are equal will prove of benefit to holders of D certificates as a class, as well as to holders of the other certificates and that the administration and final settlement of the trust will be thereby facilitated and the expense lessened. If the D certificates were found to be liens against the particular mortgages therein described only, or against such mortgages with an additional lien against all mortgages in the trust for the unrealized balance of the particular mortgages described, a most complex situation would exist of liquidation of various single mortgages before the interests of blue and T certificates could be determined—in other words there would be many small trusts to be administered and settled before the interests of the blue and T certificates could be fixed. Then, too, in a few instances more D certificates were issued against particular mortgages than the principal of such mortgages; also it appears that a large number of mortgages were allocated to both T and D certificates; also that certain D certificates originally issued against particular mortgages were afterward transferred on the card record kept by the Trust Company to the group of mortgages; also in a number of cases mortgages allocated to certain certificates and mortgaged properties taken over in lieu of foreclosure, have little prospect of paying the principal of the certificates because taxes are greatly in arrear, the properties are in disrepair and have depreciated in value and the mortgages or properties held in lieu of mortgages, yield no present income and show little equity.

2. Through foreclosure and through deeds from owners, the complainants have and will come into possession of real estate from which rent is and will be derived. They are also receiving and will continue to receive, interest on mortgages in the trust. Sheriff's fees and costs on foreclosure are to be paid, as also taxes in arrear and to accrue, water rent and insurance, and buildings on the property to which they have taken title require repair. What are the complainants' powers and duties with respect to such receipts and expenditures?

The trust agreement and the participation certificates contain no express powers on the subject, but complainants, as trustees, must protect all trust property for the benefit of their *cestuis*. As was said in *New Jersey National Bank, &c., Co. v. Lincoln Mortgage, &c., Co., 105 N. J. Eq. 557; 148 Atl. Rep. 713,* "a court of equity in its capacity as universal trustee, may in cases of emergency for the preservation of the trust estate and the protection of the *cestuis,* authorize and direct the trustees to do acts which under the terms of the trust and under ordinary circumstances they would have no power to do." The complainants are advised that they should pool all income receipts and therefrom make the payments required for the above mentioned purposes and for similar purposes. It does not appear from the evidence before me, whether the income received from all sources by complainants, is sufficient for such purposes and that fact will not be known to me until complainants file a report of their trusteeship. For the present it is sufficient to say that from income from rents and interest on mortgages, the above mentioned items should be paid. When complainants are able to file a report with the court, it may then be determined what percentage of the funds in their hands should be retained for expenses thereafter to accrue, including provision for compensation to complainants.

3. May complainants bring suit to foreclose and for deficiency, and if so, in what name? When the owners of mortgaged premises offer to convey to complainants in lieu of foreclosure, provided the owners are released from the bond, may complainants accept a deed and execute a release of the bond? May complainants accept compromise of a deficiency claim?

The trust agreement authorizes the Trust Company as agent and attorney of the certificate holders, in case of default, to collect and receive the principal and interest due on mortgages in the trust by suit or otherwise and apply the proceeds to the payment of participation certificates. The commissioner of banking and insurance, representing the Title Company, is interested only in any surplus which may exist in the proceeds of bonds and mortgages after all certifi-

cate holders and the expense of administering the trust are paid—an interest of extremely doubtful value. The certificate holders and complainants representing them, therefore have an interest, prior to that of the commissioner, in the collection of all bonds and mortgages in the trust, and they and not the commissioner should institute foreclosure and sue for and collect deficiencies.

Complainants may sue to foreclose and for deficiency and also bring suits in ejectment. In such suits they should style themselves "trustees for holders of participation certificates issued by Steneck Title and Mortgage Guaranty Company" and in foreclosure suits the commissioner of banking and insurance should be made a defendant as representing the contingent interest of the Title Company. Complainants may refrain from instituting suits for deficiency and may adjust and compromise claims for deficiency either before or after suit or judgment, when the amount of deficiency involved does not exceed $2,000. If the amount involved exceeds $2,000 they should give notice to certificate holders as provided for under question 16. Complainants may, in their discretion, accept deeds from mortgagors and release them from liability on their bonds, rather than go through foreclosure proceedings.

4. Should certificate holders be named as defendants in foreclosure suits?

The general rule is that upon foreclosure of a mortgage made to a trustee, all *cestuis que trustent* should be made parties, as well as the trustee, to the bill to foreclose, but there is an exception to the rule in cases where the *cestuis* are so numerous that it would be most inconvenient, if not practically impossible, to obtain their consent to be made parties complainant, or to serve them with process as parties defendant. In such cases they need not be made parties, but the bill of complaint should contain an allegation to show why they are not joined in the suit. *Tyson* v. *Applegate, 40 N. J. Eq. 305; Johnes* v. *Outwater, 55 N. J. Eq. 399; 36 Atl. Rep. 483; Camden Safe Deposit and Trust Co.* v. *Dialogue, 75 N. J. Eq. 600; 72 Atl. Rep. 358; Continental Bank, &c.,* v. *Fulton Realty Co., 10 N. J. Mis. R. 1105; 162*

*Att. Rep. 560.* As I have before stated the certificate holders are numerous and many are without the jurisdiction of the court—it would be most expensive to serve them with process and almost impracticable to do so and therefore complainants are advised that they need not be made parties to foreclosure proceedings. There is no committee representing them which could be made defendant in such suits for the purpose of bringing all certificate holders before the court. If such a committee should be formed it may apply to the court, should it so desire, to be given notice of all foreclosure suits.

5. May complainants extend time for payment of principal of past due mortgages and where mortgages are payable in installments, may they waive or extend time for payment of installments? May they reduce the interest rate on mortgages?

Complainants may extend time for payment of mortgages and for payment of installments thereon and in case of installment mortgages, they may in the exercise of their best judgment, enter into a new contract with the owner of the mortgaged property as to the manner in which the principal of the mortgage shall be paid. Without first giving notice to certificate holders as provided for under question 16, no extension should be longer than for one year and the interest rate specified in a mortgage should not be reduced.

6. May complainants make alterations to trust property, such as installing heating, refrigerating and other equipment and to what extent? Should they carry out existing contracts for such equipment where the same has been installed by the owner prior to complainants taking title?

Complainants may make such alterations and may carry out existing contracts therefor, limiting the cost to ten per cent. in the aggregate of the principal investment in the property to which the improvement is to attach. If the cost is to exceed such percentage they must give notice to certificate holders as provided for under question 16. If deemed advisable, they may contract for payment in installments over a period of years and may execute conditional sales agreements in connection therewith.

7. May complainants carry fire, employes' compensation, public liability, plate glass and other insurance on property mortgaged to or owned by them? May they compromise and adjust losses under policies? Title to all mortgages is in the Title Company and in case of fire loss, checks from insurers will be payable to the Title Company as owners. May complainants endorse such checks in the name of the Title Company?

The obligation to insure mortgaged property against fire loss or damage is on the owner of the property and I assume that all mortgages contain the usual clause under which the mortgagee may effect such insurance in case of the owner's default and add the premium to the mortgage debt. On property owned by complainants, they may effect all classes of insurance with any insurer authorized to do business in this state, in such sums as they may deem proper. They may compromise and adjust losses and claims in connection with mortgaged or owned property where the amount of the claim does not exceed $1,000. Where it exceeds such sum, notice of the proposed settlement shall be given as provided under question 16. When checks in payment for insurance losses against mortgaged property are drawn to the order of the owner and the Title Company as mortgagee, complainants may endorse such checks in the name of the Title Company as its agent or attorney.

8. May complainants abandon properties where they are unable, or deem it inadvisable to protect property to which they hold title, or property on which they hold mortgages, from tax sales?

In all cases where complainants believe it proper to abandon such property, they should give notice of their proposal in the manner provided under question 16.

9. May complainants sell, convey and lease real estate to which they have acquired title? May they give satisfaction or discharge of mortgages and release of part of mortgaged premises? Are they authorized to pay broker's and appraiser's fees?

They may sell and lease property upon such terms and conditions as they may deem proper and accept purchase-

money mortgages as part consideration for sales, but no lease should be made for longer than one year, unless notice be given in the manner provided under question 16. They may execute satisfactions, discharges and assignments of mortgages and for a consideration which they deem proper, they may execute releases of part of mortgaged premises. Such appraisals as the Title Company made of properties at the time it made mortgage loans, are probably now valueless and if in determining whether to accept any offer to purchase any of the trust property, or for any other specific purpose, it is necessary that the property should be appraised, the complainants are authorized to secure an appraisal. It is not necessary at this time that a general appraisal be made of mortgaged or owned property. Complainants may pay reasonable brokers' and appraisers' fees.

10. May complainants retain a real estate agent to assist them in the management of real estate and how much and from what fund should he be paid? Complainants suggest that a certain real estate agent be named as receiver to collect rent upon all applications they may make to the court for the appointment of a receiver in connection with foreclosure suits.

Except for the evidence that complainants have taken over properties mortgaged for $162,000, I do not know how many pieces of real estate they are called upon to manage. Of course complainants may employ a sufficient working force to properly manage the trust property in their hands and pay their employes reasonable compensation and such expenditures are properly chargeable against the trust estate. It is obvious that help must be employed in connection with the administration of the trust and it is possible that a competent employe could be engaged to attend to the rental of such real estate as may now or shall hereafter be in the trust, the collection of rent and the making of repairs, as well as to the inspection of the condition of mortgaged property. I do not think it presently necessary that a man whose business is that of a real estate agent should be specially employed for the purpose. With respect to rent receiverships, I think the complainant bank should be appointed to serve without

bond and that compensation allowed for its services as such should be paid into the general fund of the trust.

11. May complainants accept in payment for rent, principal and interest on mortgages, scrip or bonds issued by municipal corporations of this state, if such scrip or bonds may be used for liquidating taxes or other obligations due the issuing municipalities?

Yes, and also if such scrip or bonds may otherwise be realized on.

12. May complainants accept Home Owners Loan Corporation bonds in payment of mortgages and sell the same at current market price? May they accept such bonds for less than the full amount due on a mortgage?

Such bonds may be accepted at par value in full payment of a mortgage and they may be accepted at such value in part payment if the owner of the mortgaged property desires to pay the balance in cash. Complainants may sell any such bonds so accepted at market price.

13. Bonds and mortgages were executed to American Homes Building and Loan Association as collateral to loans granted on shares of stock in the association, which shares were also assigned to the association as collateral for such loans. Some of such bonds and mortgages and shares were assigned by the association to the Title Company and were delivered by the Title Company to the Trust Company to be placed in the group of mortgages against which participation certificates were issued. May complainants receive from said association the dues collected by it, surrender said shares to the association and release the association therefor? May complainants give credit on such shares for the full book value thereof and accept the difference between such book value and the amount due on the mortgages and cancel such mortgages?

The above named association is a mutual and co-operative association organized under "An act concerning building and loan associations" (*Comp. Stat. p. 334*) and its business has been and is being conducted under the provisions of that act and the amendments and supplements thereto. Its members are shareholders entitled to participate in its assets in

the proportion that each member contributes to its capital. It makes loans to members on their shares of stock and when it makes what is called a mortgage loan, the borrower assigns his shares to the association and as collateral, executes his bond and mortgage whereby he agrees to pay dues on his shares to the association at the rate of $1 per share per month and also interest on the amount of the loan, also payable monthly, such payments to continue until the shares pledged mature, or the borrower pays off his loan. The by-laws and constitution of the association and the bond and mortgage constitute the borrower's contract with the association and thereunder he is entitled to share in the profits of the association with his fellow members and when, by the payment of dues plus his share of profits, the borrower's shares reach matured value, the association credits such amount on his loan and discharges his bond and mortgage. Bonds and mortgages of this nature were assigned by the association to the Title Company, as were also the borrowers' pledged shares, and the Title Company paid the full principal of each of such bonds and mortgages as consideration for the assignments. Thereafter the borrower paid interest to the Title Company and continued to pay dues to the association.

A decree has been made by this court in the suit of *Steneck Title and Mortgage Guaranty Co.* v. *First National Bank of Hoboken et al.,* trustees and others (97-612) adjudging that the shares of said association assigned to the Title Company, with the bonds and mortgages accompanying the same, are held as collateral security to said bonds and mortgages and that the complainants in the instant case have the right and duty to collect dues and profits on said shares and to take all necessary proceedings for the complete recovery of the same and upon receiving satisfaction for said shares, to give good and proper releases and discharges therefor to said association. I understand that decree to authorize complainants in the instant suit to accept payment from the association of the value of such pledged shares and credit the same on the debt evidenced by said shares and the bond and mortgage, in any case where the borrower desires to pay complainants the difference between the value of the shares

and the balance due on his loan. I do not understand the decree to mean that complainants may take such payment from the association and require the borrower thereafter to pay dues on his shares to complainants until the time when the amount received by complainants from the association and the dues thereafter paid complainants, equal the amount of the borrower's loan. The Title Company took the bonds, mortgages and shares subject to the borrower's contract with the association and no decree can be made which will affect the terms of that contract, especially in a cause in which the borrower is not a party. Under his contract the borrower has the right to remain a member of the association and to share in its profits and to make payment of dues to the association until those payments and his share of the profits equal the amount of his loan, whereupon his bond and mortgage will be discharged.

If the owner of property covered by such a mortgage desires to negotiate with complainants for discharge of his debt complainants should deal with such mortgage in the same manner as with any other mortgage, that is to say, complainants should consider the security of the mortgage, the responsibility of the maker of the bond and the financial condition of the association and then exercise their judgment in the premises. I know, through proof in another case pending before me, that the commissioner of banking and insurance has, pursuant to chapters 48 and 258 of the laws of 1933, issued orders to said association restricting and limiting its payments to members on withdrawals and maturity of shares, under which orders withdrawing members can receive only a proportion of the withdrawal value of their shares, monthly. Complainants may, by agreement with and consent of the borrower, accept from the association the withdrawal value of shares held in connection with the above mentioned bonds and mortgages as fixed by the association and payable as ordered by the commissioner of banking and insurance and credit such withdrawal value on the mortgage debt and accept from the borrower the difference between the withdrawal value and the mortgage debt, such difference to be paid complainants in full, or by monthly installments. Complainants

are not authorized to credit full book value of such shares on the mortgage debt.

14. May complainants rely on records of the Trust Company in their possession as evidence of ownership of certificates and may they deal with owners as they appear by such records? May complainants transfer on their records ownership of certificates and note such transfers on the certificates?

All participation certificates provide that to be valid they must be authenticated by the certificate of the Trust Company endorsed thereon. They also provide that the interest of the holder is assignable only on the books of the Title Company and that such assignment must be noted on the certificate. Complainants do not have possession of the records of the Title Company. The Trust Company kept and complainants have what purport to be correct records of all certificates issued by the Title Company, such record being the cards hereinabove referred to. Complainants are authorized to rely on such records and to deal with owners of certificates according as such ownership appears by those records, unless proof satisfactory to complainants is produced which discloses an error in such records, in which event the record should be corrected to show the true fact. Owners of participation certificates may transfer or assign their certificates and upon production to complainants of such certificates and proper evidence of transfer or assignment thereof, complainants should endorse change of ownership on the certificate and on their records and therafter deal with the new owner.

15. Applications are made to complainants for a list of certificate holders with their addresses and the amount held by each and for information as to receipts and disbursements in connection with properties to which they hold title. May they charge for expense of furnishing such and similar information?

It appears that many requests of the nature indicated in this question have been made of complainants and that to comply with such requests entails much time and work on the part of complainants' employes. Applicants for information should pay therefor at rates to be fixed by the decree to

be entered herein after hearing the parties appearing in this cause on the settlement of the decree. All payments made for such information should go into the general fund of the trust.

16. Complainants ask the court to continue this proceeding so that complainants and parties interested may make application herein on matters not fully determined and on future questions upon such notice as the court may prescribe.

This court should have jurisdiction in this cause to determine all questions arising with respect to the administration of the trust whether originating with complainants or with any party to this suit (including as parties all certificate holders, whether specifically named in the bill of complaint or brought in by class representation). All new questions should be presented by petition entitled in the cause and be heard on such notice as the court may prescribe. Where under questions 3, 5, 6, 7, 8 and 9, notice is required to be given, such notice should be by mail to all persons who are named as defendants in the bill of complaint in this cause, at their addresses as the same appear by complainants' records. Such notice should specify what complainants propose to do and that if any party has objection thereto, he must file dissent in writing with complainants within ten days after such mailing. If within said ten days no dissent be filed with complainants, they may proceed in the manner stated by them. If written notice of dissent be given, complainants may bring the matter to the court's attention for appropriate action at such time and place as the complainants shall state in their said mailed notice that they will present the matter to the court in case of dissent filed. On any application to the court, whether by complainants or others, all questions (except those herein decided) as to the power of the court to make an order and the propriety of making it, shall be open for discussion.

Upon entry of a decree in conformity with these conclusions, complainants shall mail a general notice to all certificate holders as their names and addresses appear on complainants' records and to the commissioner of banking and insurance, informing them that this court has determined

that the claims of all certificate holders attach to all mortgages held by complainants as trustees and that no certificate holder has a valid claim against any particular mortgage and has also determined various other questions (without specifying them) touching the administration of the trust; that inspection of a copy of the court's opinion and of the decree entered herein may be had at complainants' office; that where complainants are required by such decree to give notice of future applications to the court relating to questions raised by the bill of complaint, such notice will be given by mail to the commissioner of banking and insurance and to only those certificate holders who are specifically named as defendants in the bill of complaint in this cause; that all new questions hereafter raised by certificate holders, by the commissioner of banking and insurance or by complainants touching the administration of the trust, must be presented to the court by petition entitled in this cause and will be heard by the court upon such notice as the court may prescribe. Such general notice may include any other matter which complainants deem proper and proof of mailing thereof should be filed at once.