Petitioner is trustee (as successor to Guardian Trust Company, the original trustee) for the holders of interest-bearing bonds of Lincoln Mortgage and Title Guaranty Company (hereinafter called "The Mortgage Company"), under a trust indenture made January 3d 1927. Bonds to the amount of over $13,000,000 are issued and outstanding, secured by this identure and the collateral security pledged thereunder with the trustee. These bonds become due in 1937 and 1938.
The Mortgage Company has a paid in capital and surplus of $1,800,000. It was organized under the insurance laws of New Jersey and is under the supervision of the banking and insurance department. Its business is buying and selling first mortgages (and bonds) on real estate, and issuing its own bonds secured by first mortgages owned by it.
During the last year there has been a great and widespread depression in real estate in New Jersey and elsewhere, *Page 558 
resulting in an excessively abnormal number of defaults in the payment of interest, taxes, insurance premiums, c., on The Mortgage Company's mortgages, and a consequent abnormal number of foreclosure suits by The Mortgage Company — the latter resulting in a like abnormal number of purchases by The Mortgage Company at foreclosure sales, and an inability to dispose of such properties without great losses.
The Mortgage Company incorporated a subsidiary, the Unity Corporation, as an instrumentality to make the purchases at foreclosure sales, and to carry and attempt to dispose of the purchased properties. The Unity Corporation now holds such properties to the extent of over $1,000,000 (being the amount due for the mortgage principal, interest and costs).
Under the terms of the trust indenture, when a mortgage pledged thereunder is six months in arrears as to interest, another mortgage must be substituted by The Mortgage Company in place thereof. The Mortgage Company must also maintain the trust fund at an aggregate at least equal to the aggregate principal of its outstanding bonds. If The Mortgage Company fails to foreclose mortgages in default, the trustee must foreclose, and if the trustee collects cash or purchases at foreclosure sale The Mortgage Company must deposit other securities and take over the cash or the property. Until there has been a formal default by The Mortgage Company, it is the exclusive agent of the trustee to collect the principal and interest of the pledged mortgages and has the right, generally, to deal with such mortgages as the holder thereof, in cluding the right to extend times of payment and waive conditions and defaults.
The Mortgage Company has within recent months deposited with the trustee mortgages made to The Mortgage Company by the Unity Corporation, comprising previously mortgaged premises bought in by the latter at foreclosure sale. These new mortgages are for principal sums greatly in excess of sixty per cent. of the prices for which the mortgage premises can be sold — contrary to the terms of the trust agreement — and because of this fact and because they are essentially *Page 559 
mortgages made by The Mortgage Company to itself instead of mortgages by bona fide borrowers, are ineligible to be included in the trust fund held by the trustee.
These mortgages aggregate some $534,750 out of a total trust fund of $13,773,753. There is some $422,000 in cash in the trust fund, and the balance is made up of mortgages which were eligible as collateral under the trust agreement when deposited with the trustee, but many of which are now ineligible because defaults have been made in payment of interest, taxes or insurance premiums.
Under the strict terms of the agreement therefore The Mortgage Company is in default; there are mortgages aggregating several million dollars held by the trustee either already ineligible, or which shortly will become ineligible, as collateral which it is absolutely impossible for The Mortgage Company to replace with mortgages complying with the agreement. Under the agreement The Mortgage Company is in default, and must continue so to be under the presently existing circumstances, for some time to come.
Under the trust agreement the trustee may, after notice to The Mortgage Company, formally declare The Mortgage Company in default, but is not required so to do unless requested by twenty or twenty-five per cent. of the bondholders. It has given the notice to The Mortgage Company — (the notice period has not yet expired) — it has not received any such request from the bondholders. The bonds are unregistered coupon bonds and the trustee does not know the names or addresses of the holders.
The trustee is concerned to do, in this emergent situation, what is best for the interest and protection of the bondholders. Under the agreement it has two courses only. It may declare a formal default, and sell the collateral, foreclosing The Mortgage Company's interest therein. Under the present conditions it would necessarily have to purchase the collateral, and proceed itself to foreclose the mortgages in which defaults will be made (amounting as has been said to several million dollars in all probability in the coming year), and either itself purchase the mortgaged premises and carry them until *Page 560 
able to sell them advantageously (which it could do much less efficiently and only at much greater expense than The Mortgage Company, which is organized and equipped for that business), or let them be sold to outsiders at ruinously low prices in the present market; in either event great loss will fall upon the bondholders.
On the other hand it may refrain from declaring formal default, but in that case there is grave danger that The Mortgage Company may be declared insolvent in the federal courts as being unable to carry out its contract obligations and as being unable to continue in business with safety to the public and its stockholders. Application in this behalf has already been made in the federal court, by a bondholder and a stockholder, and while the preliminary application has been refused, the matter is still pending and in abeyance until the final hearing.
The course which the trustee desires to pursue, believing it to be to the best interest and protection of the bondholders, is to accept a participation, in any mortgages taken by The Mortgage Company, to the extent of sixty per cent. of the appraised valuation of the property, provided such participation shall be the senior claim under such mortgages, and provided such mortgages shall be otherwise eligible, and to treat such participation as eligible to maintain the aggregate of the trust fund. This course would permit the mortgage company to continue to function, probably with a small profit to its stockholders (it has up to the present time in spite of the adverse conditions operated at a small profit and is being honestly and capably managed), and in any event with benefit to the bondholders because it can administer the mortgages and properties much more economically than can the trustee; and at the same time it would maintain the trust fund essentially at the same or perhaps even somewhat greater value than it has at present; and it would in all probability remove the possibility of a receivership adjudication against The Mortgage Company. In addition, if the trustee should do this, The Mortgage Company would accord to it additional rights and privileges not now possessed by the *Page 561 
trustee, which would enure to the better protection of the interests of the bondholders. A tentative agreement embodying these things has been evolved by the trustee and The Mortgage Company which both are desirous of executing and carrying out. Unfortunately the trustee has not the right so to do under the strict terms of the trust agreement.
In this emergency and predicament it has petitioned this court for advice and instructions, and authority, if possible, to permit it to do so — presenting the foregoing facts to the court — and has brought into court as respondents not only The Mortgage Company, but in addition the bondholders (by class representation) and stockholders (by class representation), also Harris, Forbes Company (the old established concern which marketed the bonds and hence has a deep business interest in the safety and protection of the value of the bonds), and the commissioner of banking and insurance of this state, charged by law with the supervision of The Mortgage Company and its affairs in the interest of the public.
All of the respondents — including the holders of a substantial number of the bonds and the holders of a substantial amount of The Mortgage Company's stock (both of the majority and of the minority interests) — appeared at the hearing. None filed answers, except Martin N. Young, the holder of a single bond (and who is one of the two persons who had instituted the insolvency suit in the federal court). With the exception of Mr. Young, all agreed on the facts and earnestly advocated the course suggested by the trustee, as being the best for the interest of the bondholders, and as being the only solution which would avoid the great loss which otherwise must almost inevitably result to the bondholders. Mr. Young filed an answer, but without proofs and without application for any opportunity to submit proofs, so that it might well be disregarded entirely — but it may be added that it makes no substantial contradiction of the facts herein before mentioned; its chief intent being to allege that some portion of responsibility for the present situation is chargeable to alleged excessive and not bona fide appraisals made by the former management of The Mortgage Company. *Page 562 
This, if true, seems entirely immaterial to the disposition of the matter non sub judice — which is to determine what, if anything, can and should be done to protect the bondholders in the present, actually existing emergency.
Mr. Young's active opposition to the suggested plan was fully and ably presented by counsel and it is a matter of satisfaction to the court to feel that it has heard everything which could be argued in opposition. Substantially the argument amounts to this: That the court has not the power to authorize or direct the adoption of the proposed agreement; and secondly that if the court had the power, it should not so act — that the thing which should be done in the present emergency is to have a default declared, have The Mortgage Company restrained from doing further business and have the entire trust estate and The Mortgage Company's affairs wound up — on the ground that to permit "the sale and resale [of the outstanding bonds] to an unsuspecting public, in view of the impairment of the trust fund as set forth in the trustee's petition, is and constitutes a fraud upon the rights of the public."
This latter seems a most astounding argument. In the first place no more bonds can be issued — the trustee would not certify them. In the second place, the course desired by Mr. Young would in nowise prevent the resale of the outstanding bonds by the present holders to other parties — and any such intending purchasers of the bonds from the present holders have ample opportunity to inquire of The Mortgage Company, of the trustee, of the banking and insurance department, and of their own financial advisers before purchasing. In the third place it utterly disregards the enormous loss which would immediately fall upon the present bondholders as the result of the steps desired by Mr. Young — and the further indirect but widespread loss which would result to the public generally; both to the holders of bonds of other mortgage companies in the state (which are numerous and many of them large), whose bonds would inevitably also become depressed in value; and to the owners of real estate who would find still greater difficulty in selling or obtaining mortgage *Page 563 
loans, because of the resulting increase in the number of persons desiring to sell or mortgage and the diminution in opportunity so to do.
That the trustee should be authorized and instructed to take the course suggested in the petition, if the court has the power, seems beyond doubt; it is difficult to see how anyone of sound business judgment can honestly doubt it, unless actuated by some other motive or interest than that of the protection of the bondholders. This conclusion is concurred in, as already indicated, not only by all the other bondholders represented, but by Harris, Forbes Company the "sponsor" for all the bondholders, and by the commissioner of banking and insurance.
Nor is there doubt as to the power of the court in the premises. It is of course quite true that ordinarily the trustee is bound, in the administration of the trust, by the terms of the trust, and that even his court has no right to authorize the trustee to depart therefrom; but it is also true that a court of equity, in its capacity as universal trustee, may in cases of emergency, for the preservation of the trust estate and the protection of the cestuis, authorize and direct the trustees to do acts which under the terms of the trust and under ordinary circumstances they would have no power to do. This power resides in the court of chancery as a part of its original inherent jurisdiction — its general administrative jurisdiction in cases of trusts.
It is so held in England as to the English court of chancery. See In re New, L.R. 1901, 2 Ch. Div. 534, a case similar in essence to the present, where the end sought was not only the benefit of all the cestuis, but their protection against loss. In In re Tollemache, L.R. 1903, 1 Ch. Div. 955, where the situation did not arise out of an emergency, and it did not appear necessary for the protection of the cestuis against loss, but merely that it would benefit all the cestuis, the same court, although recognizing its jurisdiction, declined to authorize the proposed action.
In Marsh v. Reed, 184 Ill. 263, the court, exercising this jurisdiction, directed the trustee to execute a ninety-nine-year *Page 564 
lease, although the will provided that no lease should be made for longer than ten years.
The jurisdiction and power is recognized by the authoritative text writers. 2 Perry Trusts (7th ed.) § 764 (citing many cases); Lew. Trusts (11th ed.) pp. 387, 728.
In this state the original inherent jurisdiction of the English court of chancery, is exercised by this court; and the particular extraordinary jurisdiction now under discussion has been repeatedly exercised, as is said in In re New, supra, chiefly at Chambers, or in unreported cases.
The appointment of a substituted trustee — in cases where a testator gives property in trust to a man as trustee, with no provision for any successor, and that trustee dies — is a very common exercise of this jurisdiction, and was so before the adoption of any statute. Instances similar to the one cited in the English case — where a testator directs a sale of real estate at a specified time, and at that time there is a slump in the real estate market, and the court directs the trustee to postpone the sale — have repeatedly happened here as well as in England.
The jurisdiction and power is recognized by this court inOliver v. Oliver, 3 N.J. Eq. 368 (at p. 373); FidelityInsurance, c., Co. v. United, c., Co., 36 N.J. Eq. 405 (atp. 408); and was not only recognized but exercised in NewarkSavings Institution Case, 28 N.J. Eq. 552, and Price v. Long,87 N.J. Eq. 578.
It is recognized by the court of errors and appeals in Quick'sExrs., v. Fisher, 9 N.J. Eq. 802 (at p. 805), where it is said that a trustee has no power to change the character of the trust fund and that if such change be deemed necessary, it should be made only with the permission and sanction of a court of equity — and in Lister v. Weeks, 61 N.J. Eq. 623.
I do not understand the determination in Dodd v. Una,40 N.J. Eq. 672, to deny the existence of this jurisdiction and power except in so far as concerns a trust the terms of which are created by legislative enactment. In the Newark SavingsInstitution Case, supra — a case where the facts were to a large extent like those in the case now under consideration, *Page 565 
except that the trust was one the terms of which were specified by statute — this court had directed a modification of those terms; one of the officers of the trustee had violated the order and had been adjudged guilty of contempt, and from such adjudication had appealed; the appellate court reversed the adjudication of contempt, on the ground that this court had no jurisdiction to make the original order (which was violated).
This lack of jurisdiction is, as expressed in the language of both of the justices who delivered opinion, placed primarily upon the fact that the terms of the trust were established by the legislature, and that this court had no authority to contravene the legislative enactment by varying them; secondarily, it is placed on the fact that none of the cestuis que trustent were before the court in the proceding in which the order was made. Mr. Justice Magie adds one more ground; namely, that the order in question dealt with what the trustee should do as to future
deposits, deposits not yet made, and since as to these there was not an existing trust, the court had no jurisdiction.
There are, it is true, some expressions in the opinion of Mr. Justice Magie (on page 709), which would indicate at least doubt in his mind as to the general jurisdiction under discussion, but, as I have said, the determination is not rested thereon, and in view of the long and well established fact of this jurisdiction, hereinbefore pointed out, and its prior recognition by the same court in Quick v. Fisher supra, it cannot be conceived, in the absence of an express adjudication to that effect, that it was intended to be denied.
In the instant case there is no contravention of provisions imposed by legislative enactment; and the cestuis que trustent
are before the court, by class representation, including one who is opposed and whose opposition has been fully heard.
It is of course recognized that the jurisdiction is one which should not be exercised except in an emergency and then only for the preservation of the trust estate and the protection of thecestuis. That situation exists here, and in my judgment this court not only has the power and the right to make *Page 566 
the order in question, but unquestionably ought to do so for the safety and protection of the bondholders; it would be derelict in its duty if it failed so to do.
The real estate values are actually existent; it is themarket which is temporarily lacking, and which will eventually return. The order will be made effective only for a limited time, with leave to any of the parties to apply for modification in theinterim, if occasion warrants. Moreover, in order to give as full opportunity as possible to any and all the bondholders to present and express their views, an order upon them to show cause will be made, with directions for as complete service as possible, in person or by publication.
The form of the order will be settled on February 8th, or prior thereto on two days' notice.