## T. J. MOSS TIE CO. v. WABASH RY. CO. et al.

District Court, S. D. New York.
June 21, 1935.

Frank C. Nicodemus, Jr., of New York City, receiver.

Humes, Buck, Smith & Stowell, of New York City (Gordon M. Buck, of New York City, of counsel), for New York Trust Co.

Barnett, Plaut & Schweitzer, of New York City (Roy Plaut, of New York City, of counsel), for Northwestern Mut. Life Ins. Co.

Milbank, Tweed, Hope & Webb, of New York City (Arthur A. Gammell and William D. Gaillard, Jr., both of New York City, of counsel), for Chase Nat. Bank of City of New York.

Root, Clark, Buckner & Ballantine, of New York City (William P. Palmer and A. Goodwin Cooke, both of New York City, of counsel), for committee of refunding and general mortgage bondholders.

Mitchell, Taylor, Capron & Marsh, of New York City, for City Bank Farmers Trust Co.

Cabell, Ignatius, Lown & Blinken, of New York City, for Massachusetts Mut. Life Ins. Co.

Henry W. Clark, of New York City, for Union Pac. R. Co.

WOOLSEY, District Judge.

The receivers of the Wabash Railway Company may have a decree ordering the trustees to execute the releases as prayed.

I. The Wabash Railway Company, a corporation of Indiana, having been sued on December 1, 1931, by the T. J. Moss Tie Company, a corporation of Missouri, in the Eastern Division for the Eastern District of Missouri, in a creditors' action for a consent receivership in equity,

filed its consent and joined in the prayer of the bill, and as a result thereof, Judge Charles B. Davis appointed as receivers of the said railway company Mr. Walter S. Franklin, of St. Louis, Mo., and Mr. Frank C. Nicodemus, Jr., of New York City.

On the 3d day of December, 1931, a so-called ancillary bill of complaint was filed in this court by the T. J. Moss Tie Company against the Wabash Railway Company for similar relief, and the Wabash Railway Company, having filed its consent thereto, joined in the prayer of the bill, and on the 3d day of December, 1931, out of comity, I appointed the same receivers for the said railway company here.

Under date of October 19, 1933, Mr. Walter S. Franklin, one of the receivers aforesaid, having been elected to be vice president in charge of traffic of the Pennsylvania Railroad Company, wrote a letter to Judge Davis resigning the receivership; his resignation was accepted at once, and on the same date Judge Davis appointed Mr. Norman B. Pitcairn, of St. Louis, Mo., in place of Mr. Franklin, as co-receiver with Mr. Frank C. Nicodemus.

On October 20, 1933, after due application made under a supplemental bill of complaint, by an order of Judge Patterson, Mr. Norman B. Pitcairn was appointed receiver in this court in place of Mr. Walter S. Franklin.

II. The said receivers of the Wabash Railway Company, appointed by this court, filed on April 2, 1935, an ancillary dependent suit against the following classes of defendants:

(1) The New York Trust Company, as trustee under an indenture of the first mortgage, dated January 1, 1899, of the Des Moines Division of the Wabash Railroad Company, the predecessor of the railway now in receivership here, and the Northwestern Mutual Life Insurance Company, as the holder of $873,000 of the bonds issued under said indenture out of a total issue of $1,600,000.

(2) The Chase National Bank of the City of New York, as present trustee under an indenture, dated January 1, 1925, of the refunding and general mortgage of the Wabash Railway Company, and the Metropolitan Life Insurance Company, as the holder of $3,000,000 of the bonds issued thereunder out of a total issue of $60,870,000.

The prayer of this suit was that the trustees be instructed to execute releases of a part of the mortgaged property for the reasons hereinafter set forth, and that this court hold that the defendant bondholders sued constitute an adequate representation of the cestuis que trustent for such a proceeding.

III. Between the towns of Albia and Tracy, in Iowa, a distance of about 19.55 miles, the line of the Chicago, Burlington & Quincy Railroad Company, hereinafter called the Burlington Railroad, parallels closely the line of the Wabash Railway Company, hereinafter called the Wabash Railway. The intermediate stations between the two towns above named are served by both railroads. For several years the passenger and freight traffic on both roads had been so light that in August, 1933, it became abundantly clear to those operating the two roads that a single line between Albia and Tracy jointly operated by the Wabash Railway and the Burlington Railroad would result in a very substantial saving in maintenance and taxes to each road, without in any way impinging on the service required of them by the public.

The competition of bus, truck, and other motorized transportation used on the public highway has eaten into the revenues earned by both railroads on this part of their lines with results that look yearly more ominous.

As economy of operation was the only course for the railroads under the circumstances, with the hope of reducing expenses a contract was entered into on August 31, 1933, between the receivers of the Wabash Railway and the Burlington Railroad, subject to the approval of the United States District Court, Eastern Division, for the Eastern District of Missouri, and by the Interstate Commerce Commission, in which the Wabash Railway agreed to abandon part of its railroad extending from a point near Albia, Iowa, to a point near Hamilton, Iowa, in a northwesterly direction, for approximately 11.207 miles, with the exception of certain sidings, and by which the Wabash Railway was to be given the right to operate under trackage rights over the line of the Burlington Railroad between the said points, and whereby the Burlington Railroad was to operate under track-

age rights over the line of the Wabash Railway from a point near Hamilton to Tracy, a distance of 8.343 miles, and certain sidings to be used as passage tracks, with the result that each railroad would abandon the operation of part of its track between Albia and Tracy and operate instead under perpetual trackage rights over the unabandoned portion of the other railroad.

This agreement was approved by Judge Davis in the Eastern Division for the Eastern District of Missouri on January 26, 1934.

IV. On March 12, 1934, the Wabash Railway and its above-named receivers and the Burlington Railroad, acting in pursuance of the contract aforesaid, jointly applied to the Interstate Commerce Commission asking for approval of the said contract for the abandonment of part of the track of each railway between Albia and Tracy.

On May 23, 1934, the Interstate Commerce Commission, after hearings, granted the request of the railroads and found that the joint operation of the line as proposed by the contract aforesaid would result in an estimated saving of $15,000 a year to each railroad in maintenance, operation and taxes, and at the same time made the following findings as to the losses which had resulted from the separate operation of the two lines between Albia and Tracy and the expectable earnings of the joint line:

"The average annual freight tonnage during the years 1931–33 over the present line of the Burlington between Hamilton and Tracy, sought to be abandoned, is represented as 218,403 tons. Using that figure as a basis, the Burlington estimates that the annual results of its proposed joint operation between those points would be as follows: Operating revenues $28,-805.81, operating expenses $21,799.77, net revenue from railway operation $7,006.04, and net railway operating income $6,686.-27. It is represented by the Burlington that, allocated largely on various mileage bases, its operation between the same points resulted in deficits in net railway operating income for the years 1929–33, in order, of $13,761.54, $14,325.25, $13,580.-94, $9,829.64, and $9,768.43.

"The average annual freight tonnage during the years 1931–33 over the present line of the Wabash between Albia and Hamilton, sought to be abandoned, is stated as 323,017 tons. It is represented by the Wabash that, allocated largely on various mileage bases, the operation of that line resulted in deficits in net railway operating income for the years 1929–33, in order, of $20,666.35, $18,961.06, $23,-699.14, $19,799.80, and $20,425.84. The Wabash estimates that if the proposed joint operation had been in effect during the same years the deficits in net railway operating income would have been $78.87, $2,316.86, $8,291.79, $5,563.33, and $6,984.52 respectively.

"The applicants estimate that the cost incidental to the construction of the proposed connecting tracks, turnouts, platform, and installation of signals would be $11,462 to the Wabash and $7,673 to the Burlington, which costs would be defrayed from the general funds of the respective applicants."

On May 23, 1934, the Commission made a certificate of public convenience and necessity formally approving the aforesaid contract between the railroads and thus allowed (1) the abandonment by each railroad of the part of its line therein referred to between Albia and Tracy, Iowa, as provided, after the building of the connecting tracks necessary to effectuate a joining of the two lines, and (2) the operation of the line thus jointly constituted under perpetual mutually arranged trackage agreements running, respectively, in favor of the present contracting parties and their successors.

The original certificate of convenience and necessity issued by the Interstate Commerce Commission provided that the construction of the connecting tracks to enable the joint operation of the line should be commenced on or by August 24, 1934, and should be completed on or before December 31, 1934. This time, however, has been extended. The latest order of the Commission, issued on April 9, 1935, provides that the contemplated construction of the connecting tracks should be begun not later than September 15, 1935 and should be finished by February 1, 1936.

V. The situation, therefore, has been fully covered so far as the public relations of the parties are concerned and now comes before me in a way that involves the private economy of the Wabash Railway, namely, whether the mortgage indentures of the Wabash Railroad Company, Des Moines Division, first mortgage of January 1, 1899, or the Wabash Rail-

way Company refunding and general mortgage, dated January 1, 1925, will respectively permit the present trustees under each mortgage to execute the releases necessary to put the Wabash Railway in a position to carry out its part of the agreement of August 31, 1933, which it has been advised the Burlington Railroad on its part is now ready, able, and willing to perform.

VI. In an endeavor to make performance by the Wabash Railway of the contract of August 31, 1933, with the Burlington Railroad possible, the receivers of the Wabash Railway on April 21, 1935, filed their complaint in the ancillary dependent suit above referred to against the defendants above named, alleging in substance the facts hereinbefore summarized, and asking this court:

(1) That it hold that the Northwestern Mutual Life Insurance Company and the Metropolitan Life Insurance Company be adjudged to be proper and adequate representation of the holders of bonds issued, respectively, under the Des Moines Division first mortgage of January 1, 1899, and the refunding and general mortgage of January 1, 1925.

(2) That the New York Trust Company, as trustee under the Des Moines Division first mortgage of January 1, 1899, and the Chase National Bank of the City of New York, as trustee under the refunding and general mortgage of January 1, 1925, be ordered and directed to execute and deliver to the receivers instruments of release in the form annexed to the complaint, and thus enable the Wabash Railway Company and its receivers to be in position to perform their contract with the Burlington Railroad.

The defendant New York Trust Company, as trustee of the Des Moines Division first mortgage of January 1, 1899, has filed an answer and stipulation of facts admitting the principal allegations of the bill of complaint, but alleges it is not authorized by the terms of the mortgage indenture under which it is trustee to execute the release required by the receivers, and further alleges that this court has no power to authorize any departure from the said trust instrument, unless the bondholders are all before the court, or at least the court holds they are adequately represented.

The defendant Northwestern Mutual Life Insurance Company, as owner of bonds of the first mortgage, filed an answer also admitting the principal allegations of the bill of complaint, but denying any express authority or qualification to represent the other bondholders or outstanding bonds of that mortgage, but admits that the operation of the joint line proposed by the two railroad companies would be of financial benefit to each and to the holders of bonds secured by mortgages on the railroads, and interposes no objection to the granting of the relief prayed for, except that it requests that the receivers of the Wabash Railway be required to execute certain supplemental indentures extending the lien of the mortgages to the easement or trackage rights to be secured from the Burlington Railroad under the contract.

The defendant Chase National Bank of the City of New York, as trustee under the indenture of the refunding and general mortgage of January 1, 1925, filed an answer also admitting the principal allegations of the bill of complaint, but denying its right to execute the proposed release requested from it and submitting to the court for determination whether, as the ancillary suit was originally constituted in respect of parties, there was an adequate representation of the bondholders either under the Des Moines Division first mortgage of January 1, 1899, or the refunding and general mortgage of January 1, 1925; and also whether there was sufficient facts alleged in the complaint to justify the court in ordering a departure from the strict letter of the trust indentures.

The Metropolitan Life Insurance Company, owner of $3,000,000 of bonds under the refunding and general mortgage of January 1, 1925, though duly served as a party, did not enter any appearance or file any answer.

VII. A motion was made by the plaintiffs on the bill of complaint—which, as noted above, sets forth fully the facts above detailed as to the loss of revenue, the contract and its approval by the court of original jurisdiction, and by the Interstate Commerce Commission—and on the answers above described, for a decree as against the New York Trust Company, as trustee, and the Northwestern Mutual Life Insurance Company, as bondholder, under the Des Moines Division first mortgage, and the Chase National Bank, as trustee under the refunding and general mortgage, and as against the Met-

ropolitan Life Insurance Company as bondholder thereunder for a decree pro confesso because it had not filed any answer.

A full hearing was had before me on the motion thus made by the receivers, and it seemed to me, in the first place, that the receivers had not secured so many bondholders as they feasibly could secure to be parties to the suit, and, in the second place, that it was necessary to have more definite proof than was afforded by the admitted·allegations of the complaint as to a reason for any deviation from the letter of the trust agreement.

Accordingly, on my own motion, I had an order entered directing, inter alia: (1) That the complainants forthwith file an amendment to their bill of complaint by adding as parties defendant thereto a committee representing holders of the defaulted refunding and general mortgage bonds, consisting of Messrs. John W. Stedman, James H. Brewster, Jr., George Bovenizer, and R. G. Page, which committee represents the holders of more than 25 per cent. of the bonds outstanding under the refunding and general mortgage, and also by adding thereto as additional defendants, certain additional parties known to own and hold bonds of the two issues referred to in the bill of complaint; (2) that the supplemental subpœnas be issued to such proposed additional defendants as were within this district, and (3) that the complainants submit to the court at a formal hearing on notice (a) proof of any allegation of the bill of complaint herein as amended not admitted by the answers herein, or otherwise, to be true; (b) proof of the physical condition of the sections of line of railroad proposed to be abandoned and the physical conditions of the proposed joint line, particularly with reference to improved grades, maintenance costs, and operating conditions; (c) proof of competition of other modes of transportation new since the execution of the above-mentioned mortgages; and (d) proof of any other facts deemed material as supporting the necessity and propriety of the relief prayed by the complainants herein; and (4) that the complainants mail a copy of the order to each of the holders of first mortgage Des Moines Division bonds and of refunding and general mortgage bonds whose names were known to the complainants, to the end that they may, if so advised, intervene as parties defendant in the cause.

The additional parties named, including the bondholders' committee of the refunding and general mortgage bonds issued under the indenture of January 1, 1925, were duly served with subpœnas, and notices of the pendency of this ancillary cause, and its purposes were given to all known holders of the bonds under the two mortgages.

The new defendants holding the Des Moines Division first mortgage bonds and the amounts of their respective holdings are:

| | |
|---|---|
| Mary Colgate | $50,000 |
| Utilities Mutual Insurance Company | 25,000 |
| Postal Life Insurance Company | 10,000 |
| City Bank Farmers Trust Company, as Trustee under the Will of Simon Stern, deceased | 10,000 |

The new defendants holding refunding and general mortgage bonds and the amounts of their respective holdings are:

| | |
|---|---|
| The Prudential Insurance Company of America | $2,852,000 |
| Union Pacific Railroad Company | 1,105,000 |
| Massachusetts Mutual Life Insurance Company | 250,000 |

The bondholders' committee filed an answer similar to that filed by the Chase National Bank of the City of New York, submitting the legal questions to the determination of the court but not taking a position for or against the granting of the relief asked by the complainants.

The Union Pacific Railroad Company filed an answer consenting to the granting of the relief prayed for, and alleging: "That since the execution of the aforesaid trust indenture there have been radical changes in the art of transportation and that many of the provisions of trust indenture executed as recently as ten years ago must, in order to protect the trusts from waste, loss and depreciation, be moulded to meet existing conditions. The transaction referred to in the bill of complaint having been approved and authorized by the Interstate Commerce Commission in the exercise of its jurisdiction under the Interstate Commerce Act and being supported by the findings of said Commission that substantial economies will be achieved without impairing the capacity or ability of the complainants to serve the public, commends itself to this defendant as meriting the approval and sanction of this Court."

The Massachusetts Mutual Life Insurance Company has appeared and filed

an answer admitting the principal allegations made in the ancillary bill of complaint and joining in the prayer thereof.

The City Bank Farmers Trust Company, as trustee under the Will of Simon Stern, deceased, has appeared and filed an answer admitting ownership of the bonds, but denying special authority to represent other bondholders and submitting the case for the determination of the court.

All the other defendants within the district were duly served with process, but none other has filed an answer, although the time for filing answers has now elapsed.

Furthermore, as to bondholders outside this jurisdiction, as above observed notice was given to all the known bondholders of the respective mortgages of the pendency of the cause giving them an opportunity to intervene with advice that there would be a final hearing in the matter on June 7, 1935.

VIII. On June 7, 1935, I held a hearing at which counsel for all parties had an opportunity to be present and at which the receivers called and examined witnesses to supplement some of the allegations of the complaint and to comply with my order of May 23, 1935.

As a result of said hearing I find:

That the section of railroad to which the suit relates involves approximately twenty miles between Albia and Tracy, in the state of Iowa.

That it is proposed to abandon about 11 miles of the existing line of the Wabash Railway between those points and about 9 miles of the existing line of the Burlington Railroad, the Wabash Railway thereafter to use the Burlington track and the Burlington to use the Wabash track, thus creating a single line approximately 20 miles in length.

That the present Wabash Railway maximum grade is 1.75 per cent., whereas on the new line the maximum grade will be 1.25 per cent.

That the tracks of the proposed joint line are in a level country, laid in the river bottoms, of which the Wabash Railway will be required to maintain 9 miles and the Burlington Railroad 11 miles.

That the Burlington Railroad track which the Wabash Railway will use is laid with rail weighing eighty pounds to the yard and pretty generally throughout with creosoted ties. The Wabash Railway track to be retired and eliminated is laid with various weights and ages of rail, averaging about 70 pounds to the yard. On this section there are no creosoted ties and it is estimated that the complainants will save approximately $11,000 a year in maintenance.

That the agreement was designed to utilize a single track to the greatest advantage, for two tracks are now unnecessary and probably never will be necessary.

That as a result of the arrangement the complainants will save the cost of maintaining 11 miles of track and the Burlington Railroad the cost of maintaining 9 miles of track.

That the exchange is a fair one between the two companies and will avoid otherwise useless duplication.

That at the present time the complainants operate daily one passenger train in each direction and two freight trains. Years ago there were three passenger trains in each direction daily and two freight trains. The train service of the Burlington Railroad is substantially the same.

That the arrangement is made practicable by reason of the fact that between Albia and Tracy the lines of the two companies are closely parallel and by consolidating operations the two companies will jointly maintain one track, ample for the traffic, thereby greatly reducing maintenance expenses.

That there is ample room on the right of way to construct an additional track should traffic revive to such a point as to make such additional track necessary, but that in recent years the construction of double track has been superseded by the use of centralized control, whereby the switches and signals are controlled from a central point and trains are run by signals directed by a train dispatcher located at a central point.

That double tracking is, therefore, no longer considered necessary unless at least 30 trains daily travel in each direction, so that on this particular joint line it would be many years before traffic would rise to a point where even central control would be considered an operating necessity.

That during the past few years highway construction has been active; that there are state highways paralleling the joint track all the way from Albia to Tracy, and thence into Des Moines, and as a result traffic between these points has practically dried up.

That the railroad line in question is sandwiched in between two improved highways built within the last five or six years, and since the execution of the Des Moines Division first mortgage and the refunding and general mortgage.

That as a result of highway competition gross passenger earnings, which in 1925 amounted to $27,381.06, fell in 1934 to $1,956.86, and that gross freight revenues, which reached $279,032.99 in 1925, fell in 1934 to $101,022.60.

That it is necessary for the Wabash Railway to do everything possible to reduce expenses in order to justify continuing operation of this branch of the railroad.

That the present revenue is not adequate to support the line, that there has been a deficit in its operation for the last five years and increasing deficits are expectable, and that the contract of August 31, 1933, is a measure designed to prevent abandonment.

That if the Wabash Railway and the Burlington Railroad lines were today carrying the maximum amount of freight between Albia and Tracy and were also operating the maximum number of trains which they have ever operated over that line, a single track would be more than sufficient to carry all traffic in each direction.

That even if the former traffic were restored it could be handled by the single line and could be increased up to a total of 25 trains a day in each direction before it would be necessary to resort to central control or double tracking.

■ IX. As trusts are creatures of courts of equity and depend on them for the maintenance of their purposes, it necessarily follows that an equity court of an appropriate venue may administer any trust in order to maintain the purpose thereof. This power of the equity court is only part of its general administrative power in connection with its trust creations, and for many years has been constantly exercised by equity courts, both in England and in this country. Usually when the necessary parties are before the court, the exercise of this jurisdiction is in Chambers, and, as a result, the principle which is under discussion here has not often become articulate in the reports.

■ However, there is a very valuable English case, In re New, [1901] 2 Ch. 534, in which a deviation by trustees from the authority given by the instrument of trust was ordered by the English Court of Appeal. The principle to be followed in a proceeding for such an order was well summarized by Lord Justice Romer in the course of the argument when he said, [1901] 2 Ch. at page 543): "The principle seems to be this— that the Court may, on an emergency, do something not authorized by the trust. It has no general power to interfere with or disregard the trust; but there are cases where the Court has gone beyond the express provisions of the trust instrument—cases of emergency, cases not foreseen or provided for by the author of the trust, where the circumstances require that something should be done."

Judgment was reserved and in giving the judgment of the unanimous court, Lord Romer further dealt with the basis on which a court of equity acts in such cases in [1901] 2 Ch. 534, at page 544, as follows: "But in the management of a trust estate, * * * it not infrequently happens that some particular state of circumstances arises for which provision is not expressly made by the trust instrument, and which renders it most desirable, and it may be even essential, for the benefit of the estate and in the interest of all the cestuis que trust, that certain acts should be done by the trustees which in ordinary circumstances they would have no power to do. In a case of this kind, which may reasonably be supposed to be one not foreseen or anticipated by the author of the trust, where the trustees are embarrassed by the emergency that has arisen and the duty cast upon them to do what is best for the estate, and the consent of all the beneficiaries cannot be obtained by reason of some of them not being sui juris or in existence, then it may be right for the Court, and the Court in a proper case would have jurisdiction, to sanction on behalf of all concerned such acts on behalf of the trustees as we have above referred to."

And later, [1901] 2 Ch. 534, at page 545, the Lord Justice says: "Of course, the jurisdiction is one to be exercised with great caution, and the Court will take care not to strain its powers. It is impossible, and no attempt ought to be made, to state or define all the circumstances under which, or the extent to which, the Court will exercise the jurisdiction; but it need scarcely be said that the Court will not be justified in sanctioning every act desired by trustees and beneficiaries merely because it may appear beneficial to the estate; and certainly the Court will not be disposed to sanction transactions of a speculative or risky character. But each case brought before the Court must be considered and dealt with according to its special circumstances."

It seems to me that this is a very good statement of the principle to be applied and the proper attitude for an equity court to take in applying it, when, as here, the court is asked to instruct trustees to do an act for the obvious benefit of the estate, and the trustees claim that it would constitute a deviation from the trust instruments.

I think that on any reasonable interpretation of the trust instruments before me, the release which the plaintiffs ask me to order to be given by the New York Trust Company, as trustee under the indenture of the Des Moines Division first mortgage of January 1, 1899, is within the authority of the trust indenture of that mortgage; but I think that the release which I am asked to order from the Chase National Bank of the City of New York, as trustee of the refunding and general mortgage of January 1, 1925, is clearly outside the authority given by the trust indenture of that mortgage. Consequently, I have before me in one proceeding the two aspects of the questions which are presented to a court of equity on requests for instructions to trustees to do acts affecting trust estates.

X. Before dealing with the merits of the plaintiff's requests, however, I must turn aside and deal with a very important question which always arises in cases of this kind, and that is whether the cestuis que trustent are adequately represented, for the jurisdiction invoked necessitates the exercise of an informed judicial discretion by the equity judge and he should be certain that he has a sufficient representation of all the interested parties before him to insure his hearing all sides of the question involved, whether it be of interpretation of the powers conferred on the trustee by the trust instrument or of the advisability of instructing the trustee to deviate therefrom. Only with full light thrown on either of these questions from all sides can the equity judge exercise his discretion with any feeling that no consideration of importance has probably been overlooked.

The extent to which a trustee has a right to act in connection with trust property shades like a spectrum from the instances wherein he is expressly given by the trust instrument itself the power which he is asked to exercise, through cases in which such a right may be implicit in varying degrees by a proper interpretation of the trust instrument, down to cases in which it is perfectly obvious that, for the benefit of the trust estate, the trustee must have instructions to act entirely outside of any authority conferred on him by the trust instrument and thus to deviate from it.

In every respect wherein the equity court is asked to exercise such powers as are here invoked, the situation should be treated as one in which it is possible that, on an examination of the pleadings and documents involved and after hearing evidence if necessary, the court will order a departure from the trust instrument.

Therefore, I do not think there is any proper basis as some of the cases seem to suggest for a differentiation between the representation of cestuis que trustent necessary in proceedings where it is sought merely to interpret the powers given to a trustee by the trust instrument and cases in which the trustee is obviously being asked to deviate from it. There should be as full a representation of the cestuis que trustent on the record in respect of one kind of suit as in respect of the other.

The case of Colorado & Southern Railway Co. v. Blair, 214 N. Y. 497, 108 N. E. 840, Ann. Cas. 1916D, 1177, is the leading case in this country dealing with the necessary parties in proceedings of this kind. It holds that it is not sufficient for the plaintiffs who ask the court to instruct a trustee to deviate from the authority given by a trust instrument to make only the trustee a defendant to the suit.

■ Furthermore, it seems to me that it is not sufficient for the plaintiffs asking such relief, as is here sought in respect of a trust to secure an issue of bonds, to join in the role of defendants only a single bondholder with the trustee, as was done here in the first instance, in respect of each trust. Cf. New Jersey National Bank & Trust Co. v. Lincoln Mortgage & Title Guaranty Co., 105 N. J. Eq. 557, 148 A. 713, 716.

■ As I indicated above, the reason why I made the order of May 23, 1935, providing that the plaintiffs should join as defendants additional bondholders under each mortgage and also the protective committee of the holders of bonds issued under the refunding and general mortgage of January 1, 1925, was that it seemed to me the plaintiffs in this case had not done the best they could under the circumstances—a minimum of effort always required—to get as full a representation of all interested parties as possible.

As a result of the order of May 23, 1935, and the steps taken by the plaintiffs pursuant thereto, I now have before me a representation of bondholders of the Des Moines Division first mortgage of January 1, 1899, amounting to 90.38 per cent. of the total bonds outstanding thereunder, and notice has been given to all the 108 known holders of bonds issued under that mortgage. Because that mortgage is not in default and ownership certificates are filed with the coupons that have been coming through semiannually to the Wabash Railway Company, it was not difficult to trace the ownership of these bonds.

In respect of the refunding and general mortgage of January 1, 1925, however, the situation is different. I now have before me 25.51 per cent. of the bondholders under that mortgage. I am persuaded that this is as high a representation as is practicably feasible under the circumstances, because, as that mortgage is in default, coupons have not been arriving periodically with ownership certificates attached, and it is not possible to find out who are the present owners and holders of a large percentage of the bonds, for they were widely distributed throughout the United States.

The ganglion of contact, therefore, with the bondholders under that mortgage necessarily has to be principally through their protective committee, for the members of that committee represent the bondholders who have deposited their bonds and are fiduciaries for such bondholders, and if not authorized to act in such a situation as this it would be their duty to notify their depositors and to secure from the court time within which to get instructions from them.

I do not, however, desire to be understood as laying down any general rule as to any fixed percentage of bondholders who must be served in a proceeding of this kind, because no such rule can be safely made. The situation must be left plastic so that each particular case can be dealt with according to its particular situation.

My purpose in writing this opinion and going so fully into the situation, largely noncontroversial, which is presented to me, is to show what seems to me to be a wise procedure to follow in attempting to get personal jurisdiction of the parties necessary to secure for the court as broad a background as possible of argument and advice for the exercise of its discretion.

The fact, therefore, that I was fortunate in getting jurisdiction over such a large percentage of the two bond issues involved here must be looked as an instance of good luck, and not in any respect as a quantitative measure of the percentage of cestuis que trustent necessary to a proceeding of this kind.

■ Each case which arises will present its own individualized problem. The main point which I wish to emphasize is that if a mortgage be in default and there be a bondholders' protective committee, it should certainly always be brought in as a party defendant in cases of this kind because of its fiduciary duty to guard the bondholders' interest, and because by making it a party more holders of defaulted bonds can probably be reached for service of process or notice than by any other procedure.

I find that the parties now before the court constitute an adequate class representation of the bondholders as cestuis que trustent under the circumstances here involved, and, therefore, having had a full hearing, I am free to deal with the merits of the plaintiffs' prayers.

XI. I turn now from the question of the presence of the necessary parties be-

fore me to the question of the merits of the granting of the relief requested.

I recognize, of course, that as indicated by the quotation above made in In re New, 1901; 2 Ch. 534, 544, 545, the power here invoked is one that should be exercised with great circumspection, and that such an application as the receivers are here making should be met by the court with a very cautious hospitality.

■■■ Whilst I am comforted, in considering whether I should grant the plaintiffs' prayer, by the findings and the order of public convenience and necessity made by the Interstate Commerce Commission, I am not thereby controlled, nor, unless by stipulation of the parties, do I have a right to rely thereon, in dealing with the questions before me, as a basis for my judicial acts. Therefore, I have pursued an independent inquiry which convinces me, by evidence which I have heard, that there has been a radical change in the situation since the trust indentures were executed and that it is for the interest of the two trust estates to have the relief sought by this suit granted.

I think it is perfectly clear from the facts which have been shown to me, as I have indicated in my findings, that since the mortgages were made there has been a change in the art of transportation, undreamed of at the time of the mortgage indenture of January 1, 1899, and not really predictable when the mortgage indenture of January 1, 1925, was made.

The competition of motorized transportation using the public highways has impinged heavily on railroad earnings, especially on branch lines for short hauls. This competition has created in respect of the earnings for this section of the Wabash Railway in particular an emergency which was not foreseeable when the trust indentures were executed and, hence, was not provided for therein, and in which circumstances have arisen requiring that something should be done to prevent serious and continual erosion of the trust estate. Cf. New York State Railways v. Security Trust Company of Rochester, 135 Misc. 456, 238 N. Y. S. 354, 360, affirmed without opinion 228 App. Div. 750, 238 N. Y. S. 887; New Jersey National Bank & Trust Co. v. Lincoln Mortgage & Title Guaranty Co. et al., 105 N. J. Eq. 557, 148 A. 713, and also the excellent discussion of the circum-stances under which an equity court will instruct a trustee to deviate from the terms of the trust instrument contained in an article "Deviation from the Terms of a Trust" by Professor Austin Scott of the Law School of Harvard University, one of the great law teachers of this generation, which appeared, May, 1931, in volume XLIV, Harvard Law Review, at page 1025.

By reason of the fortunate circumstance that between Albia and Tracy the tracks of the Wabash Railway run closely parallel with those of the Burlington Railroad, the opportunity has been afforded certainly to reduce and possibly to eliminate the deficit from this section of the Wabash Railway by joining the tracks and operating on the basis above set forth over the short distance where the two lines are so close together.

The wisdom of this plan is, apparently, not seriously challenged, and I think that it is a properly justified exercise of my discretion as an equity judge in charge of this situation to grant the relief prayed for by the receivers, and, consequently, I do so.

XII. As I mentioned above, in the answer of the Northwestern Mutual Life Insurance Company the suggestion was made that through the execution of supplemental indentures by the Wabash Railway Company the liens of the mortgages on its properties should be extended so as to cover and include the easement or trackage rights which would be given to it by the Burlington Railroad on performance of the contract of August 31, 1933, between it and the Burlington Railroad.

Until the purpose of the contract of August 31, 1933, has been accomplished, however, the easements or trackage rights of the Wabash Railway Company over the part of the proposed joint line owned by the Burlington Railroad will not have been created, and, consequently, the suggestion in the answer of the Northwestern Mutual Life Insurance Company is premature at the present time, although the question raised may well be considered as the basis of the quid pro quo which should be secured by the trustees under the mortgage indentures in exchange for the releases which they will be ordered by my decree herein to give.

My present decree, however, need not deal with this matter in any way for all the parties are subject to my jurisdic-

tion. But my decree should provide that the trustees may at any time apply to this court, at the foot of the decree, for further relief in respect of the matter presently under discussion, and in order to keep time open the decree will also provide that the present term of this court is extended until after the complete execution of this decree and final disposition of all matters thus reserved for future determination or action by this court; and in any event, for a period of three years from the date hereof with leave to any party to this cause at any time prior to the three years to apply to this court for further extension of said term of court.

This will leave the matter sufficiently plastic to enable this court to deal with any further exigency which may arise in connection with the situation in case the joint operation for some reason turns out not to be a success, or in the event that the trustees should desire to make such an application as is above indicated. The matter of a supplemental indenture was mentioned so incidentally as to make it quite impracticable at the present time to make any further provision with regard to it.

XIII. This opinion may constitute the findings of fact and conclusions of law in this cause and an order must be embodied in the decree made herein so providing.

Settle order and decree on notice.