**Alan C. RIEVMAN, Walter Pistner, Liv Anspach, Irwin E. Garfield, as Trustee for B.G. Enterprises, Inc., Defined Benefit Pension Plan and Trust Dated 12/1/76, Geseg, Inc., and J. Allan Mactier, Plaintiffs,**

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Bankers Trust Company, and Citibank, N.A., Defendants.**

No. 85 Civ. 3694 (RLC).

United States District Court,
S.D. New York.

June 21, 1985.

Lowey, Dannenberg & Knapp, P.C., New York City for plaintiffs; Stephen Lowey, Richard Bemporad, Jill Raskin, of counsel.

William Klein, II, Tenzer, Greenblatt, Fallon & Kaplan, New York City, to plaintiffs Liv Anspach and J. Allan Mactier.

Peter R. Stoll, Weinberg, Zipser, Arbiter & Heller, Los Angeles, Cal., to plaintiffs Irwin E. Garfield and Geseg, Inc.

Joseph A. Rosenthal, Morris & Rosenthal, P.A., Wilmington, Del., Cravath, Swaine & Moore, New York City, for defendant Burlington Northern R. Co.; Robert D. Joffe, David A. Barrett, Michael J. O'Brien, Roy E. Hoffinger, Alden L. Atkins, of counsel.

Shearman & Sterling, New York City, for defendant Citibank, N.A.; Charles C. Parlin, Jr., David J. Mark, James Bodovitz, of counsel.

White & Case, New York City, for defendant Bankers Trust Co.; Jeffrey Barist, Lawrence Fenster, Aldo A. Badini, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

This action concerns two series of bonds issued in 1896 by the Northern Pacific Railway Company ("Northern Pacific"). The first, 4 percent Prior Lien Railway and Land Grant Gold Bonds ("Prior Lien Bonds"), were issued pursuant to a mortgage dated November 10, 1896. The Prior Lien Bonds pay 4 percent annual interest and mature on January 1, 1997. They were issued in a face amount of $121.6 million, of which approximately $69.9 million remained outstanding as of April 22, 1985. The second series of bonds, 3 percent General Lien Railway and Land Grant Gold Bonds ("General Lien Bonds"), were issued pursuant to a second mortgage dated November 10, 1896. The General Lien Bonds pay 3 percent interest and mature on January 1, 2047. They were issued in a face amount of $60 million, of which approximately $47.8 million remain outstanding. Neither issue of bonds is callable by the issuer before maturity. Both mortgages were executed in New York and the bonds were issued in New York.[1]

Northern Pacific was merged into the Burlington Northern Railroad Company ("Railroad") in 1970, and Railroad is now obligor of the bonds. Since 1981, Railroad has been a wholly-owned subsidiary of Burlington Northern Inc., a holding company. Bankers Trust Company is the successor trustee of the Prior Lien Bonds, and Citibank, N.A., is the successor trustee of the General Lien Bonds (collectively, "trustees").

The bonds are secured by two types of collateral—first, by railroad property owned by Northern Pacific as of November

---

1. The parties agree that New York law applies in this diversity action.

10, 1896 ("Railroad Properties"). The Railroad Properties include the lines of railroad and related rights of way, all extensions and branches and any improvements and appurtenances thereto. Railroad Properties also include all equipment (including after-acquired equipment) used on the mortgaged railway lines, as well as locomotives and other rolling stock, and the buildings, stations and shops pertaining to the mortgaged railway lines. Second, the bonds are secured by millions of acres of land in the northwestern United States (the "Resource Properties") originally granted to Northern Pacific's predecessor by Congress to encourage construction of the railroad. Today, the Resource Properties remaining subject to the mortgage liens comprise approximately 1.9 million acres of land in fee simple, and 2.4 million acres of mineral rights.

Plaintiffs are bondholders, who collectively hold $439,000 par value of the bonds. They are supported in this suit by other individuals and institutions holding or representing holders of more that $43 million par value, out of a total of $117.7 million par value, of the bonds outstanding. Plaintiffs bring this suit as a class action on behalf of all bondholders.

All the parties to this litigation agree that the Resource Properties are now worth many times the $117.7 million face value of the bonds they secure; plaintiffs estimate the land's current value at "billions of dollars" (Plaintiffs' brief at 6). So long as the Resource Properties remain subject to the mortgage liens, however, the Railroad cannot benefit from the development or sale of the properties. That is because the mortgages do not provide for the withdrawal of excess collateral, or for the substitution of collateral. Further, in the event of sale of Resource Properties, the mortgages require the Railroad to deposit all the proceeds with the trustees, as collateral. Thus the Railroad would reap no benefit from the sale or development of the properties. Since the bonds are not callable before maturity, the bondholders can effectively block or "hold up" the Rail-

road from exploiting the Resource Properties until all the bonds mature in 2047.

Precisely because they have this "hold up" value, the bonds (which are traded over the counter on the New York Stock Exchange (NYSE)) have commanded prices far above their value as debt obligations alone. For instance, on April 19, 1985, the Prior Lien Bonds traded at 3 percent above their value as debt obligations, and the General Lien Bonds at 66 percent above such value (Batkin Aff. ¶¶ 7–8). Bondholders speculated that the Railroad would be so eager to release the land from the mortgage liens that it would some day offer to buy back the bonds at a premium—perhaps even above par (Railroad's brief at 24).

The Railroad wishes to have the Resource Properties released from the mortgage liens. It has attempted to accomplish this without buying back the bonds from the holders. Instead, on April 19, 1985, it entered into agreements with the trustees (the "Letter Agreements") whereby the trustees will release the Resource Properties from the mortgage liens on June 22, 1985, provided that certain conditions are met to protect the bondholders. The central condition is the so-called Deposit Plan, under which the Railroad will deposit in irrevocable trusts sufficient United States securities to satisfy fully all future financial obligations of the bonds as they become due. In essence, the government securities would substitute for the Resource Properties as collateral for the bonds and would guarantee timely payment of all bond obligations.

The Railroad has already purchased a portfolio of government securities for $63.4 million, containing bonds with varying maturity dates totaling $184.315 million in principal amount. This is sufficient to meet all outstanding bond obligations as they become due. For instance, the portfolio will yield $4,815,205 in 1986, when the Railroad's obligations under the bonds will not exceed $4,814,752. In 1997, the year in which the Prior Lien Bonds mature, the Railroad's total obligations will be approximately $67.5 million. The portfolio that

year will yield $67.56 million in interest and principal amount. The longest-term securities will mature in 2014 and 2015. The yield then will be sufficient, without reinvestment, to pay the principal and all future interest payments due on the General Lien bonds, which mature in 2047.

With government paper securing every dollar of bond interest and principal, the plaintiffs certainly cannot argue that the Deposit Plan would impair their security. On the contrary, the Deposit Plan would give plaintiffs an iron-clad guarantee of timely payment of interest and principal. *See, e.g., Taxpayers and Citizens of Shelby Co. v. Shelby Co.,* 246 Ala. 192, 20 So.2d 36, 39 (1944) (United States securities are "uniformly regarded as a perfectly safe ... investment"); Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 76* (1983) (government securities are *"essentially risk free* as to the amount, timing, and collection of interest and principal") (emphasis in original). Nevertheless, plaintiffs oppose the plan, because it would eliminate the hold up value of their bonds. If the Letter Agreements are implemented, the Railroad will not be required to offer plaintiffs large premiums to buy back the bonds in order to free up the Resource Properties for sale and development. The bonds would then be valuable only as debt obligations, and it is anticipated that their value on the market will plummet.

To protect the bondholders against this sudden drop in bond value, the trustees included a tender offer at current market prices as a second condition for the release of the Resource Properties. Pursuant to the Letter Agreements, the Railroad is currently offering to buy back all outstanding bonds at $53.50 per $100 par value for the Prior Lien Bonds and $39 per $100 par value for the General Lien Bonds, a price slightly above their market price on the day before the Letter Agreements were made public. The bondholders thus have the opportunity to sell their bonds back to the Railroad at slightly above current market price. Since the market price is expected to fall precipitously once the Resource Properties are released and the bonds lose their hold up value, prudent bondholders will feel compelled to accept the Railroad's price.

Plaintiffs oppose the agreement between the trustees and the Railroad, even though it includes the tender offer. They hope to block the plan to substitute collateral and force the Railroad to negotiate with them for the release of the Resource Properties. Presumably, plaintiffs believe they will be able to hold out for prices higher than those now offered by the Railroad in its tender offer.

The case is currently before the court on plaintiffs' motions for class certification and for a preliminary injunction.

## I.   CLASS CERTIFICATION

■   The motion for class certification is unopposed. The class for which certification is sought consists of all persons and entities who hold the bonds, or their successors in interest, excluding those bonds held by the Railroad in its treasury. The requirements for class certification under Rule 23(a), F.R.Civ.P., are satisfied in this case: the class is so numerous—as of April 22, 1985, there were more than 1,000 geographically dispersed bondholders (Complaint ¶ 10)—that joinder of all members is impractical, there are questions of law and fact common to the class, plaintiffs' claims are typical of the claims of the class, and plaintiffs will fairly and adequately protect the interest of the class. Similarly, the requirements of Rule 23(b)(1)(A) and (b)(2), F.R.Civ.P., are satisfied: prosecution of separate actions would create a risk of inconsistent or varying adjudications, and the defendants have acted on grounds generally applicable to the class, thereby making appropriate relief with respect to the class as a whole. Accordingly, the motion for class certification is granted.

## II.   PRELIMINARY INJUNCTION

■   To obtain a preliminary injunction in this circuit, "a movant must make a 'showing of (a) irreparable harm and (b) either (1)

likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly' in its favor." *Rockwell International Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 586 (2d Cir.1983), *quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979). The court turns first to the question of irreparable harm.

### 1. *Irreparable harm*

Plaintiffs offer three reasons why they would suffer irreparable harm if implementation of the Letter Agreements is not enjoined. First, they argue that what is at stake in this case is plaintiffs' interest in land. Plaintiffs note, quite rightly, that it is a well-settled principle of equity jurisprudence that every tract of land is considered unique, "so that a remedy at law which does not secure to plaintiff the interest in land to which he is equitably entitled, or does not prevent substantial injury thereto, is not adequate." H. McLintock, *Handbook of the Principles of Equity* § 44 at 105 (1948).

Strictly speaking, however, plaintiffs do not have any direct interest in the land *qua* land. What they have is a mortgage on the land; "[a] mortgage is merely an interest by way of security for debt, and a mortgagee has no title, but only a lien upon the land." *In re Braddock Ave.*, 251 A.D. 669, 672, 297 N.Y.S. 301, 305 (1st Dep't 1937), *aff'd*, 278 N.Y. 163, 15 N.E.2d 563 (1938). Even if the Railroad were to default, plaintiffs would not take title to the land; rather, they would be entitled to the proceeds from the sale of the land to the extent of the unsatisfied debt. Consequently, the mere fact that land is involved is not sufficient to render the threatened harm irreparable.

Second, plaintiffs argue that they will suffer irreprable harm if implementation of the Letter Agreements is not enjoined because the amount of money damages would be difficult to ascertain in a subsequent trial. The law is settled in this circuit "that a remedy at law may be considered inadequate when the amount of damages would be difficult to prove [.]" *Rockwell International Systems, Inc. v. Citibank, N.A., supra*, 719 F.2d at 586. *See also Gerard v. Almouli*, 746 F.2d 936, 939 (2d Cir.1984) (affirming the District Court's finding of irreparable harm on the basis that "it would be impossible to produce an accurate money damages figure"); *Danielson v. Local 275, Laborers International Union of North America, AFL–CIO*, 479 F.2d 1033, 1037 (2d Cir.1973) ("[i]rreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate"); *Foundry Services, Inc. v. Beneflux Corp.*, 206 F.2d 214, 216 (2d Cir.1953) (Hand, L., J., concurring) ("impossibility of ascertaining with any accuracy the extent of the loss ... has always been included in [the] meaning" of the phrase, irreparable harm).

The Railroad argues that damages would not be difficult to ascertain. According to the Railroad, if the release of property and tender offer buy-back are not enjoined now but are subsequently adjudged to have been illegal, plaintiffs can be made whole by receiving the difference between the tender offer bond price and whatever would have been a fair price, as determined by expert testimony. At maximum, the Railroad argues, it will be obligated to pay the difference between the tender offer price and par value ($100). Since money damages would be available, the Railroad asserts, the harm cannot be considered irreparable, and an injunction should not issue.

The problem with the Railroad's argument is that if the release and tender offer go forward, it will be exceedingly difficult to ascertain after the fact what a "fair price" would have been. The Railroad's reliance on expert testimony is misplaced. This case is unlike most other tender offer or merger and acquisition cases, where experts can be relied on to estimate what the market would have done had a disputed act not been performed. As the Railroad's own investment banker explained: "In a

normal merger situation, when I am asked as an investment banker to give a 'fairness' opinion, I can value the assets being acquired by, for example, evaluating the earnings stream produced by those assets and comparing the premium or multiple of those earnings being offered to premiums that have been offered in similar transactions. Thus, objective standards are obtainable and can be applied. In this case, however, the purpose of the offer was to provide liquidity to the bondholders at the current market prices.... For the purposes of a 'fairness' opinion ..., *it is impossible to value objectively the 'hold-up' premium*" (Batkin Aff. ¶ 15) (emphasis added).

If the Letter Agreements are implemented, it will be difficult, if not impossible, to determine what price the bondholders and the Railroad would have finally agreed on in a buy-back to release the properties. The appreciation in value of the Resource Properties may be viewed as a pie to be divided between the bondholders and the Railroad. There is no objective way to determine how big the respective slices would or should be. Nor is it true, as the Railroad urges, that the outside limit of the Railroad's liability would be par. It is possible that the Railroad would ultimately agree to pay more than par in order to obtain early release of the valuable properties (See Railroad's brief at 24).

This is a case where, if an injunction does not issue, it will be "difficult, and sometimes virtually impossible, for a court to 'unscramble the eggs.'" *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir.1973) (citations omitted). The opportunity for doing equity is thus considerably better now than it would be later on. *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (2d Cir.1969). The court is satisfied that the money damages would be difficult to assess. Accordingly, the threatened harm is irreparable.

Even if that were not the case, plaintiffs have made a third argument—that the harm would be irreparable because the

bondholders are threatened with the imminent delisting of their securities. The bonds are currently listed on the NYSE. But as the tender offer's offering circular warns, the bonds may be delisted by the exchange upon completion of the offer. Rule 802.00 of the NYSE provides that bonds may be delisted if the aggregate market value of principal amount of the outstanding bonds falls below $1 million, or for various other reasons inapplicable here. If a significant number of bonds are tendered pursuant to the tender offer, there may not be enough bonds outstanding to meet Rule 802.00's requirements.

In *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255 (2d Cir.1984), the Second Circuit explicitly held that NYSE delisting constitutes irreparable harm. The court affirmed the issuance of a preliminary injunction, noting:

Listing on the "Big Board" protects the liquidity of shares, and reassures shareholders and potential purchasers that the extensive NYSE listing requirements are being met. *See Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 254 (2d Cir.1973). Moreover, as we noted in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.1975), *cert. denied*, 423 U.S. 947 [96 S.Ct. 364, 46 L.Ed.2d 282] (1975), the investing public places great stock in these protections:

... [L]isting on the New York Stock Exchange carries with it implicit guarantees of trustworthiness. The public generally understands that a company must meet certain qualifications of financial stability, prestige, and fair disclosure, in order to be accepted for that listing, which is in turn so helpful to the sale of the company's securities. Similarly it is held out to the investing public that by dealing in securities listed on the New York Stock Exchange the investor will be dealt with fairly and pursuant to law.

*Id.* at 1381. *Cf. United Funds, Inc. v. Carter Products, Inc.*, [1961–64 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,288 (Balt.Cir.Ct. May 16, 1963) (enjoining

stock issuance that would lead to loss of NYSE listing, which constituted "valuable corporate asset").

The Railroad's attempts to limit and distinguish *Norlin* are unpersuasive. The law in this circuit is clear: the threat of NYSE delisting—as candidly set forth in the Railroad's tender offer in the instant case—constitutes a threat of irreparable harm sufficient to support the issuance of a preliminary injunction.

## 2. *Likelihood of success on the merits*

As the Railroad concedes in the tender offer's offering circular, "[t]he Mortgages, which were signed in 1896, do not provide by their terms for the modification thereof, or a release of collateral in the manner contemplated by the Deposit Plan, without the consent of the holders of all outstanding Bonds." Plaintiffs argue that in the absence of language providing for the release or substitution of collateral, the trustees and the Railroad may not agree to the substitution of collateral contemplated in the Deposit Plan. The bonds, plaintiffs point out, are a contract between the Railroad and the bondholders. The contract included the provision that a particular collateral—the Resource Properties—would secure the debt, and it did not provide for the substitution or release of that particular collateral. Bondholders entered into the entire contract, plaintiffs assert, purchasing the right to interest and principal payments, as well as the right to insist that the collateral not be substituted without their consent. If the Railroad now wishes to substitute collateral—if it wishes to vary the terms of the contract—it cannot do so without obtaining the consent of the bondholders.

The plaintiffs cite *Hollister v. Stewart*, 111 N.Y. 644, 18 N.E. 782 (1889), in which the New York Court of Appeals voided a plan of reorganization that was contrary to the terms of a railroad mortgage. The court held:

The plaintiff had a clear right to stand upon his contract, and the trustees had no power or authority to compel him to

make a new and different one. We are not concerned with his motives but only with his rights. Without his consent, the company and the trustees, the other parties to the contract could not vary its terms ... The proposition is almost too plain for argument. Unless the railroad syndicates or committees are to be put above the Constitution, the trustees cannot set aside and change their contract with plaintiff of their own volition, without his consent.

*Id.* at 659–60, 19 N.E. 782. *See also St. Louis & San Francisco Railroad Co. v. Guaranty Trust Co. of New York*, 205 N.Y. 609, 99 N.E. 162 (1912).

A case even more closely on point is *Colorado & Southern Railway Co. v. Blair*, 214 N.Y. 497, 108 N.E. 840 (1915), where the court held that trustees under a railroad mortgage did not have the power to sell or otherwise release the property securing the mortgage. As in the case at bar, the railroad wished to sell some property that was under a mortgage lien. The court held: "We think it plain that a trustee in such a case as this has no power to change or compromise the security pending a default, unless such power was conferred by the instrument creating the trust." *Id.* at 512, 108 N.E. 840.

The Railroad, on the other hand, argues that despite the absence of any provision for the substitution of collateral, the trustees and the Railroad may substitute collateral where, as here, the bondholders' security would not be impaired by the substitution. The Railroad argues strenuously that the only legally protected right the bondholders have is to payment of the dollar amounts of principal and interest on the bonds when due. *See Prudence Co. v. Central Hanover Bank & Trust Co.*, 237 A.D. 595, 600, 262 N.Y.S. 311, 317 (1st Dep't.), *aff'd*, 261 N.Y. 420, 185 N.E. 687 (1933) (the purpose of the mortgage is "to assure payment of the bonds when due by keeping sufficient funds with the trustee to accomplish that end"). The Railroad notes that the relationship between a corporate bondholder and the corporation is one of

creditor and debtor only; the bondholder is not granted any interest in the corporation's assets. *Cass v. Realty Securities Co.*, 148 A.D. 96, 100, 132 N.Y.S. 1074, 1078 (1st Dep't 1911), *aff'd*, 206 N.Y. 649, 99 N.E. 1105 (1912); *Marx v. Merchants' National Properties, Inc.*, 148 Misc. 6, 7, 265 N.Y.S. 163, 165 (Sup.Cit.N.Y.Co.1933). The Railroad argues that where the bondholders' only right—the right to payment—is not harmed by the substitution of collateral (and *a fortiori* where, as here, that right is absolutely guaranteed by the substitution), bondholders have no cause of action.

The Railroad asserts that *New York State Railways v. Security Trust Co. of Rochester*, 135 Misc. 456, 238 N.Y.S. 354 (Sup.Ct.Monroe Co.1929), *aff'd mem.*, 228 A.D. 750, 238 N.Y.S. 887 (3d Dep't 1930), is dispositive of plaintiffs' claims. In that case, the court allowed the release and abandonment of a portion of the railway system covered by a mortgage agreement, even though the agreement did not provide for such abandonment. The court emphasized that the abandonment and release should be allowed because circumstances had changed—advances in competing modes of transportation had rendered unprofitable the portion of railway in question. "Neither mortgagor nor mortgagee can change the tide of events or alter new conditions arising in the course of time, and both should be prepared to meet new situations and to adjust the properties covered by the mortgage to the changed circumstances." *Id.* at 357. The Railroad argues that changed circumstances justify the release of the Resource Properties in this case, as well. *See also Central Railway Co. of New Jersey v. Central Hanover Bank & Trust Co.*, 29 F.Supp. 826 (S.D.N.Y.1939) (Woolsey, J.) and *T.J. Moss Tie Co. v. Wabash Railway Co.*, 11 F.Supp. 277 (S.D.N.Y.1935) (Woolsey, J.), two cases in which this court allowed the abandonment and release of unprofitable railroad property subject to mortgages that did not provide for such abandonment and release.

The Railroad also relies on several cases from outside this jurisdiction, most notably, *Beaumont v. Faubus*, 239 Ark. 801, 394 S.W.2d 478 (1965). In that case, State of Arkansas bonds had been issued with the contractual provision that they were to be serviced by "highway revenues". The state, however, needed such revenues for construction of new highways and bridges. To free the highway revenues, the legislature authorized their release in return for the deposit of United States government securities in an amount sufficient to cover the state's payment obligations under the bonds. The State Supreme Court affirmed the dismissal of a class action complaint attacking the substitution of security, holding:

> The real obligation, from the standpoint of impairment of contractual considerations in the case of bond issues, is the obligation of the issuing authority to pay the bonds, principal and interest, when due. This is the matter that is of vital significance to the bondholders. Bondholders necessarily expect and have a right to be paid, but payment does not always have to be made from a particular fund or source.... *It follows, therefore, that any change involving a substitution of security which does not diminish the prospects of, or adversely interfere with, expected payment does not constitute a contractual impairment....* This substitution will leave the bondholders with government securities backed by the faith and credit of the United States, which is the foundation of all money values and without which there would be no financial security. The bondholders' prospects of payment are not diminished.

394 S.W.2d at 482–83 (citations omitted) (emphasis added).

The Railroad also cites *Van Wyck v. Alliger*, 6 Barb. (N.Y.) 507 (1849), an old Appellate Division case which rejected a mortgagee's request for an injunction restraining the commission of waste—specifically, the cutting of timber—on mortgaged premises, on the ground that the mortgagee had failed to show that the injunction was necessary to preserve his security. In response to the mortgagee's argument that

the waste should be enjoined even if it would not impair his security, the court stated:

> If this doctrine—that the land is a security for the mortgage debt, and as the whole estate is a security, the court should enjoin any cutting of timber or other waste, without reference to the sufficiency or insufficiency of the security—is to prevail, great wrongs could be perpetrated under the rule. Suppose A has a mortgage of $300 upon timbered land belonging to B worth as many thousand dollars, and B goes on to cut timber and clears the land, without any design or even probability of impairing A's security, still he shall be enjoined if the doctrine of some of these cases is to be sustained. I am not prepared to sanction such a doctrine.

*Id.* at 513. Apparently, this remains the rule today. *See, e.g., Band Realty Co. v. North Brewster, Inc.,* 59 A.D.2d 770, 771, 398 N.Y.S.2d 724, 725 (2d Dep't 1977) ("foundation of an action for waste by a mortgagee is the impairment of the security of the mortgage with knowledge of the lien"). The Railroad argues that the rule that applies to enjoining waste should apply, by analogy, to enjoining substitution of collateral.

The Railroad also argues that the cases bondholders cite for the proposition that a mortgagor may not substitute collateral without the mortgagees' consent are inapposite, because they deal with substitutions of collateral that would have impaired the mortgagees' security. *Hollister v. Stewart, supra,* for example, involved a diversion to new securities of the collateral pledged by the mortgagor to secure payment of the plaintiffs' bonds. And in *Colorado and Southern Railway v. Blair, supra,* the mortgagor sought a release of property that it had purchased for over $1 million in order to sell it for only $150,000.

On balance, plaintiffs have the better argument. First of all, many of Railroad's key cases may be distinguished from the case at bar. For instance, the trilogy of *New York State Railways v. Security Trust Co. of Rochester, supra; Central Railway Co. of New Jersey v. Central Hanover Bank & Trust Co., supra;* and *T.J. Moss Tie Co. v. Wabash Railway Co., supra,* differs from the instant case in crucial respects. First and foremost, none of those cases permit what the Railroad and trustees propose to do in the instant case. None holds that when circumstances change, the mortgagor and the trustees may, on their own, substitute collateral. Rather, the cases hold that when circumstances change, the mortgagor may petition a court of equity to direct the trustees to take actions not particularly provided for in the trust instruments. The cases contemplate prior court approval, after a hearing at which all interested bondholders can be heard—not the sort of independent agreement between Railroad and trustees involved in the instant litigation. *See, e.g., T.J. Moss Tie Co. v. Wabash Railway Co., supra,* 11 F.Supp. at 285.[2]

Further, all three of those cases involve the release and abandonment of unprofitable property, not the release for sale or development of highly valuable property. In the latter case, it may be legitimate to require the Railroad to negotiate with bondholders for the release, as a way of splitting the windfall from the appreciation of the Resource Properties between the Railroad and the bondholders. In the former, it seems unfair for a court of equity to require a railroad to bargain for the privilege of cutting its losses.

*Beaumont v. Faubus, supra,* is also not on point. In that case, the defendant was the governor of Arkansas and the issue was not whether the substitution of collateral constituted *breach* of contract (as it is in the instant case), but rather whether the

---

**2.** The Railroad suggests that the court consider the merits of the proposed release and tender offer now, and exercise its equity power to instruct the parties to go forward (Railroad's brief at 67). Though the court has the power to do this, it does not believe it is able to make a final determination on the fairness of the proposed transaction now, with the speed called for on a motion for a preliminary injunction.

substitution of collateral constituted a constitutional *impairment* of collateral by the sovereign. The court stated explicitly that an action that was not an impairment could nevertheless be a breach. *Id.* 394 S.W.2d at 482 ("[e]very unilateral change in a contract may amount to a technical breach of that contract, but not every breach is an impairment of the contractual obligation").

In addition, at least one of the key cases relied on by plaintiffs cannot be effectively distinguished by the Railroad, and appears to govern this case. The Railroad argues that *Colorado & Southern Railway v. Blair, supra,* is inapposite because the proposed transaction would have impaired the mortgagees' security—the mortgagor sought to sell for only $150,000 collateral it had purchased for over $1 million. But the inference that the proposed substitution would have been an impairment is without basis. In *Colorado & Southern Railway,* the mortgagor proposed to deposit the $150,000 proceeds as substitute collateral. There is no evidence that the mortgagor was planning to sell the land for less than its then-market value; on the contrary, it is reasonable to assume that the mortgagor would not have sold the land for $150,000 if it could have gotten a better price. If the land was worth only $150,000 at the time of the proposed sale—no matter what it was worth when the railroad first bought it— then a deposit of $150,000 as cash collateral would not have compromised the security, but only changed it. There would have been a substitution of cash for land, much like the substitution proposed in the instant case's Deposit Plan, but no impairment of security.

More importantly, the *Colorado & Southern Railway* court *assumed that the release would have been in the interest of the bondholders,* and nevertheless reached its decision that the trustees could not release the mortgaged property without the bondholders' consent. 214 N.Y. at 511, 108 N.E. 840. The New York Court of Appeals seemed to be laying down a *per se* rule: because of the "vast sums invested in railroad bonds" and the need to insure investor confidence, railroad mortgage trustees may not "sell, change, or in any manner compromise the security except as authorized in express terms or by necessary implication" —even where the sale or change would not harm the bondholders' interests. *Id.* Note that the court forbids the trustees to "sell, change, *or* ... compromise" the security. The ruling applies not only to cases where security would be "compromised" (i.e. impaired), but also to cases where the security would merely be "sold" or "changed."

Plaintiffs have made out a good case. Though not absolutely certain that plaintiffs would prevail on the merits at trial, the court is persuaded that plaintiffs have made a sufficient showing of the *likelihood* of success on the merits to warrant preliminary relief.

3. *Serious questions going to the merits and a balance of hardships tipping decidedly in movants' favor*

However, even if the court's analysis of the law is flawed as to plaintiffs' likelihood of success on the merits, it is clear that this is a difficult, complex case, fitting the alternative standard in this circuit for preliminary relief if on balance the movant will be harder hit if the motion is denied. Able counsel for all the parties have advanced interesting and well-supported arguments. It is beyond dispute that serious questions on the merits have been raised that need to be litigated

The Railroad argues that even if there remain serious questions on the merits, the balance of hardships does not tip decidedly in movants' favor. It asserts that an injunction would cause greater hardships for the Railroad in three ways. First, the exploration and development of the Resource Properties would be delayed. Second, the Railroad would be exposed to market risk, because it would be left holding a portfolio of government securities whose market value fluctuates inversely with general interest rates in the economy. Third, an injunction would cast a "speculative cloud" on one of the Railroad's securities, and would "inevitably raise[ ] questions in the

market concerning [the Railroad's] other securities" (Railroad's brief at 83). On the other hand, the Railroad asserts, plaintiffs would not suffer a hardship if the Letter Agreements are implemented. Plaintiffs' only legal right—the right to payment of interest and principal—would be guaranteed, and plaintiffs could cash in their bonds at the current market price if they so desired. The Railroad urges: "[E]quity will withhold as oppressive an injunction when the injury is not serious or substantial and the injunction would subject the other party to great inconvenience and loss." *Michelsen v. Leskowicz,* 55 N.Y. S.2d 831, 836 (Sup.Ct.Suffolk Co.1945), *aff'd,* 270 A.D. 1042, 63 N.Y.S.2d 191 (2d Dep't 1946).

The Railroad cites *Abell v. Safe Deposit & Trust Co. of Baltimore,* 192 Md. 438, 64 A.2d 722 (1949), as a similar release-of-mortgaged-property case, in which the court refused to nullify an unauthorized release of collateral because to do so would have harmed the mortgagor greatly, but would not have benefited the mortgagee in any meaningful way. The Maryland Supreme Court found that maintenance of the mortgage lien would "harass or injure the Company and [was] not necessary to protect bondholders against any actual threatened impairment of security." 64 A.2d at 727.

*Abell* is inapposite. There the court was concerned with *post hoc* relief, not with a preliminary injunction. Significantly, the court held that "the release of the mortgage by the Trustee to the Company was a violation of the contract between the Company and the bondholders, and a breach of duty by the Trustee." *Id.* at 726. Though the court refused to nullify the release after the fact, it is not clear whether it would have preliminarily enjoined it to prevent it from occuring in the first place. Perhaps more importantly, in *Abell,* the plaintiffs apparently were not interested in negotiating for a hold up premium, but

rather in blocking the development of the encumbered land. *Id.* Thus they were not losing any hold up premium, but rather just the technical right to prevent development. The plaintiffs in this case *are* interested in negotiating for release of the properties, and they would lose their ability to do so if the Letter Agreements are implemented. Plaintiffs' position is clear: "We are not here to kill any possibilities of there being a development of these resources. We are not a dog in the manger. That's not the point. We are just saying, 'When you have a deal, if you want to change it, come to us, let's talk about it, let's negotiate it. You've got to live by your deal. If you want to vary it, then do it, but don't do it unilaterally. You don't have the legal right to do it. The trustees don't have the right as fiduciaries to permit it. .You can't do it'" (Hearing transcript at 23).

The Railroad's recitation of the harms it would suffer if implementation of the Letter Agreements is enjoined is unconvincing. The Railroad has waited ninety years to develop the Resource Properties; surely it can wait but a few more weeks. Indeed, the Railroad's own vice-president and treasurer admitted that he does not "believe anything terrible" would result from delay of the proposed transaction (Boyle dep. at 51). The potential harm from market fluctuation is *de minimis,* and the fear of a "speculative cloud" over all the Railroad's security is groundless. Further, it is not true that withholding an injunction would not harm any of their protected legal rights; plaintiffs appear[3] to have a legal right to insist that the collateral will not be substituted without their consent. Realistically, this means that the bondholders have a right to bargain for the release of the property; if the property is released now, that right will be irretrievably lost. I find the balance of hardships clearly tips in movants' favor.

Accordingly, plaintiffs' motion for a preliminary injunction is granted. Defendants

---

**3.** The court is not now willing to hold with finality that plaintiffs have this right, but only that plaintiffs have shown a likelihood of estab-

lishing this right at a trial on the merits—that they appear to have this right.

Railroad and trustees are hereby enjoined from: (a) implementing the Letter Agreements dated April 19, 1985; (b) releasing any or all of the Resource Properties; and (c) proceeding with the tender offer commenced by Railroad to purchase any and all outstanding bonds.

IT IS SO ORDERED.