**Alan C. RIEVMAN, Walter Pistner, Liv Anspach, Irwin E. Garfield, as Trustee for B.G. Enterprises, Inc., Defined Benefit Pension Plan and Trust Dated 12/1/76, Geseg, Inc., and J. Allan Mactier, Plaintiffs,**

**v.**

**BURLINGTON NORTHERN RAILROAD COMPANY, Bankers Trust Company, and Citibank, N.A., Defendants.**

**No. 85 Civ. 3694 (RLC).**

United States District Court,
S.D. New York.

Sept. 5, 1986.

Lowey, Dannenberg & Knapp, P.C., New York City (Stephen Lowey, Richard Bemporad, of counsel), for plaintiffs.

Cravath, Swaine & Moore, New York City (Robert D. Joffe, Roy E. Hoffinger, Alden L. Atkins, David A. Barrett, Rutgers

University School of Law, of counsel), for defendant Burlington Northern R. Co.

White & Case, New York City, for defendant Bankers Trust Co.

Shearman & Sterling, New York City (Charles C. Parlin, Jr., David J. Mark, of counsel), for defendant Citibank, N.A.

## OPINION

ROBERT L. CARTER, District Judge.

Over a year ago, in an opinion with which familiarity is assumed, this court entered a preliminary injunction against a proposed plan to substitute the collateral that secured $117,700,000 worth of bonds. *Rievman v. Burlington Northern Railroad Co.*, 618 F.Supp. 592 (S.D.N.Y.1985) (Carter, J.). The case is now before the court on the motion of the plaintiff class to enter a permanent injunction, and the cross-motions of defendants Burlington Northern Railroad Co. ("Burlington") and Citibank, N.A. ("Citibank") to grant them summary judgment and dismiss the case as moot.

## FACTS

The facts of this case are both interesting and complex enough to bear the limited repetition required by these motions. The Northern Pacific Railway Company ("Northern Pacific"), merged into Burlington in 1970, issued two series of bonds in 1896. One series, issued pursuant to a mortgage and paying four percent interest, will mature on January 1, 1997 ("Prior Lien Bonds"). The second series, issued pursuant to a second mortgage on the same properties and paying three percent interest, will mature on January 1, 2047 ("General Lien Bonds"). Both series are secured by two types of collateral: railroad properties that Northern Pacific owned as of November 10, 1986; and "Resource Properties," or property interests granted to Northern Pacific's predecessor in interest by Congress. The Resource Properties—comprised of mineral rights as well as

lands held in fee simple—have become far more valuable than the bonds that they secure. Par value for the outstanding bonds is $117,700,000. The Resource Properties may be worth billions. Approximately 1,900,000 acres of land in fee simple and 2,400,000 acres of mineral rights remain subject to the bonds' mortgage liens.

Neither series of bonds may be called by the issuer prior to maturity. Proceeds from the sale of any of the Resource Properties must be deposited with the bonds' trustees.[1] Burlington may withdraw excess collateral only to the extent expended in improvements to the railroad lines formerly operated by Northern Pacific, labelled "additions and betterments" ("A's and B's"). Burlington thus has only a limited financial incentive to sell or develop the Resource Properties.

Speculation that Burlington would be forced to pay a premium—called "hold-up" value—to the bondholders in order to disencumber the Resource Properties has driven up the bonds' market value. The record shows that on April 19, 1985, the Prior Lien Bonds traded on the New York Stock Exchange ("NYSE") at three percent above their value as debt obligations; on the same day, the General Lien Bonds traded at 66 percent above that value.

Northern Pacific's first recorded attempt to release the Resource Properties from the mortgage liens took place in 1959. Plaintiffs' Exhibits 28 and 29.[2] That aborted effort did not survive the trustees' vigorous opposition. *Id.* In 1973, Burlington sought the advice of two law firms regarding modification of the mortgages; both concluded that the mortgages barred all means of substituting collateral. Plaintiffs' Exhibit 63.

The third attempt to release the Resource Properties from the mortgage liens brought Burlington to this court. On April 19, 1985, Burlington signed two agree-

---

1. Citibank is the trustee for the General Lien Bonds, and Bankers Trust Company is the trustee for the Prior Lien Bonds. Collectively, they shall be referred to as "the trustees."

2. "Plaintiffs' Exhibits" refer to the exhibits introduced in connection with the hearing for a preliminary injunction.

ments ("Letter Agreements") with the trustees. The Letter Agreements imposed several conditions on the trustees' release of the mortgage liens. The first was the provision of substitute collateral in the form of a portfolio of United States Securities placed in irrevocable trusts. Burlington had already purchased such a portfolio. These trusts would have allowed Burlington to pay all bond obligations, both principal and interest, as they became due. They would absolutely guarantee Burlington's obligations to pay the bondholders; they would also nullify the bonds' hold-up value, because Burlington would have achieved its goal of releasing the Resource Properties from the liens.

The second condition was intended to protect the bondholders against the anticipated decline in the bonds' market value upon the publication of the substitution plan. It consisted of a tender offer for the bonds at a price slightly higher than their market value immediately prior to the announcement of the Letter Agreements. The remaining provisions of the Letter Agreements dealt with the bonds' rating, the accounting treatment of the transaction, and indemnification of the trustees.

Plaintiffs opposed the transactions proposed in the Letter Agreements. Their complaint, filed on May 15, 1985, sought both declaratory and injunctive relief. On June 14, 1986, they moved for a preliminary injunction against implementation of the Letter Agreements, release of the Resource Properties and the tender offer. On June 21, 1986 (one day before the transactions contemplated in the Letter Agreements were to be consummated), that motion was granted and the case was certified as a class action. In granting the preliminary injunction, we applied the governing standard of *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70 (2d Cir. 1979), which requires a showing of: (1) irreparable harm; and (2) either (a) likelihood of success on the merits or (b) a serious question going to the merits and the balance

of hardships in movant's favor. First, we held that the bondholders would suffer irreparable harm from the implementation of the Letter Agreements because it would be difficult, if not impossible, to ascertain money damages from the loss of the hold-up premium. *Rievman*, 618 F.Supp. at 597.[3] Next, we held that the plaintiff class had shown a likelihood of success on the merits. Relying on *Colorado & Southern Railway Co. v. Blair*, 214 N.Y. 497, 108 N.E. 840 (1915), we held that it was likely, though not certain, that the bondholders would be able to show that the defendants could not substitute their collateral without their consent. We interpreted *Colorado & Southern Railway* to lay

> down a *per se* rule: because of the 'vast sums invested in railroad bonds' and the need to insure investor confidence, railroad mortgage trustees may not 'sell, change, or in any manner compromise the security except as authorized in express terms or by necessary implication' —even where the sale or change would not harm the bondholders' interests.

*Rievman*, 618 F.Supp. at 601 (*citing Colorado & Southern Railway*, 214 N.Y. at 511, 108 N.E. 840).

Finally, we held that even if the bondholders had not proven their likelihood of success on the merits, at the very least they had shown that there were serious questions going to the merits and that the balance of hardships tipped decidedly in their favor. 618 F.Supp. at 601. The potential harm to Burlington from the injunction was *de minimis*. The bondholders' apparent right to bargain for the release of the property, on the other hand, would be "irretrievably lost" in the absence of injunctive relief. *Id.* at 602. Accordingly, the court issued a preliminary injunction barring Burlington and the trustees from "(a) implementing the Letter Agreements dated April 19, 1985; (b) releasing any or all of the Resource Properties; and (c) proceeding with the tender offer commenced

---

**3.** As an alternative holding, the court found that irreparable harm would result from the bonds' probable delisting from the NYSE as a result of the tender offer.

by [Burlington] to purchase any and all outstanding bonds." *Id.* at 603.

Burlington abandoned the proposed defeasance plan after issuance of the injunction on June 21. Negotiations with the bondholders are in stalemate. Lowey Reply Affidavit, Exhibit 3 (Interview with R. Bressler, January 4, 1986). Burlington sold off the portfolio of United States Securities that was to have provided the substitute collateral. Dell'Osso Affidavit, ¶ 10. Burlington now states that its:

> present intention is not to enter into any transactions similar to those contemplated by the Letter Agreements if this action is dismissed as moot. Under those circumstances, it has determined that it will live with the liens of the Mortgages for the foreseeable future. That is not to say that there is no possibility that the Railroad might sometime within the next 61 years reconsider its decision and at that time seek a release of the Resource Properties other than in accordance with the applicable provisions of the Mortgages.... However, there are so many factors that would enter into such a decision and so many events that would affect any judicial assessment of such a decision that the Court should not now enter an injunction that would attempt to cover all situations for the next 61 years.

*Id.* at ¶ 11. Thus, Burlington candidly eschews any promise that it will never undertake similar or even identical transactions to those proposed in the Letter Agreements.

### DISCUSSION

The cross-motions present the court with two distinct issues. The first is whether we have been divested of the power to hear this case. If not, we must decide whether to exercise that power and grant the injunctive relief that the bondholders seek.

A party's renunciation of challenged activity rarely renders a case moot. "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.'" *County of Los Angeles v. Davis,*

440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). Burlington contends that this *W.T. Grant* exception to the mootness doctrine applies only to cases involving enforcement of public law. We note that *W.T. Grant* and other cases that rely upon it were indeed suits brought by public authorities enforcing public law. *See, e.g., United States v. Generix Drug Corp.*, 460 U.S. 453, 457 n. 6, 103 S.Ct. 1298, 1300 n. 6, 75 L.Ed.2d 198 (1983); *DeJong Packing Co. v. United States Department of Agriculture*, 618 F.2d 1329 (9th Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1980). In fact, the language of *W.T. Grant* stresses that parties cannot bypass "public law enforcement" by stopping their illicit behavior and then arguing mootness. 345 U.S. at 632, 73 S.Ct. at 897. However, subsequent case law focuses on the reasonable likelihood of recurrence of the challenged behavior. For example, in *Terry v. Penn Central Corp.*, 668 F.2d 188 (3d Cir. 1981) the court reviewed an abandoned merger that was but one of a series of proposed acquisitions. The court was not enforcing any "public" right, merely the rights of corporate shareholders. Burlington suggests that *W.T. Grant* should apply to private suits only where the plaintiff's asserted right lies in an area of public concern, such as discrimination, labor relations or safety regulation. However, we do not believe that a bright-line distinction can be drawn between suits asserting such public rights and suits asserting private or contractual rights. The focus in this kind of a mootness inquiry is not on the nature of the right, but on the defendant's opportunity and probability of repeating the challenged behavior. To guide our analysis of whether this case has become moot, we must make "[p]redictions ... as to the probability of recurrence, the magnitude of any injury that would result, and the feasibility of preventing any injury by a future suit." 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3533.5 at 325.

Burlington's candor makes it easy to analyze the first criterion. Burlington

admits that it may attempt to structure an identical transaction in the future. It has abjured any promise otherwise. Burlington's qualified disavowal resembles the abandonment of a proposed merger scrutinized by this court in *Fuchs v. Swanton Corp.*, 482 F.Supp. 83 (S.D.N.Y.1979) (Sand, J.). There, the defendant corporation said that it "presently considers its previous attempt [of merging] ... abandoned." *Id.* at 90. Judge Sand noted that the likelihood of a renewed merger plan precluded dismissal of the suit as moot. Although Burlington argues that intervening events—such as decreased profitability of developing the Resource Properties, and increased cost of United States Securities—make it less likely that an identical transaction will be attempted soon, some defeasance effort seems reasonably likely.

As to the second criterion, the court's previous opinion granting the preliminary injunction details the injury that the bondholders would suffer should Burlington repeat its attempt to substitute collateral. *Any* attempt to substitute collateral, no matter how structured, would pose the same irreparable harm to the bondholders: the impossibility, after any substitution, of valuing the hold-up premium. The magnitude of this injury was an adequate basis to exercise our power and grant the preliminary injunction; it is no less adequate to defeat a claim of mootness.

Finally, we look at the feasibility of preventing future injury by means of a future lawsuit. Although this particular transaction was announced well enough in advance to allow the bondholders to challenge it in court, Burlington—who bears the burden of showing that its actions moot the case, *W.T. Grant*, 345 U.S. at 633, 73 S.Ct. at 897—offers no assurance that future proposals will be. The transactions proposed in the Letter Agreements, since they included a tender offer, necessarily could not be surreptitious. Future substitution attempts may not include tender offers. Thus, the bondholders may not have the opportunity to prevent another defeasance. Essentially, this court's earlier opinion determined that the bondholders were entitled to judicial evaluation of their rights

prior to any defeasance effort. That interest deserves protection and precludes a finding of mootness. Defendants' motions are denied.

■ The bondholders have moved to make permanent the preliminary injunction that this court entered on June 21, 1985. Although, as discussed above, we have not been divested of our power to hear this case, the injunctive relief that the bondholders seek would be an inappropriate exercise of that power. The only portion of the preliminary injunction that retains vitality is that which would enjoin the defendants from any release of the Resource Properties not contemplated by the mortgages. The court was not fully certain as to the plaintiffs' right to this relief when it issued the preliminary injunction; nothing adduced in relation to this motion diminishes our uncertainty. We cannot issue an injunction absent a specific proposal to release the properties. Thus, we cannot grant the relief that plaintiffs seek. However, we must protect plaintiffs' right to a judicial declaration of their rights prior to any defeasance. Accordingly, we retain jurisdiction in the case to enable plaintiffs to contest, prior to implementation, any plan to release the Resource Properties.

IT IS SO ORDERED.